[Crim. No. 22203. Dec. 11, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
VINCENT LOUIS, Defendant and Appellant.

**COUNSEL**

Brad D. Brian, under appointment by the Supreme Court, and Ruth E. Fisher for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William R. Weisman, Norman H. Sokolow, Robert F. Katz and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190.1 et seq.).

Charged with, among other offenses, murder with a special circumstance, defendant and his codefendants were tried before two separate juries. Virtually the same evidence was presented to each. The sole exception was the reading of the prior testimony of a prosecution witness whose credibility was indisputably minimal. Although known to be highly unreliable and likely to disappear, the witness was released from custody on his own recognizance before defendant's trial through the efforts of the prosecution; the witness promptly vanished. ▮ After trial the codefendants went free; defendant was convicted and sentenced to death. Because the reading of that prior testimony—which came from a most questionable source but plainly spelled the difference between life and death—was admitted in violation of defendant's constitutional and statutory right of confrontation, we conclude that the judgment must be reversed as a miscarriage of justice.

On the night of May 10, 1980, a man ran up to the cashier's booth at a USA gasoline station in Monrovia, robbed the attendant, Thomas Walker, of cash and Kool cigarettes, and fled firing a handgun resembling a .38 caliber revolver. Responding in his patrol car to shouts coming from the vicinity of the station, Officer Hedrich of the Monrovia Police Department saw a person run from the scene and disappear from view around a corner. Turning the corner, Hedrich caught sight of a van pulling away from the curb. He gave chase, the van attempted to elude him, but he eventually caused it to stop. Three persons were found in the van: Vincent Ates, Darlene Johnson, and Basil Louis (hereafter Basil). Walker was brought to the van and positively identified Ates as the person who robbed him. Ates was arrested but inexplicably Johnson and Basil were not. Hedrich searched the van and found only a sink, a doghouse, and several large piles of clothing. The vehicle was impounded at the Owl Garage. Its owner was Basil's brother Claudell Louis (hereafter Claudell).

About 2 a.m. on May 12, Officer Hedrich observed smoke coming from the lot at the Owl Garage and as he approached noticed that the van was on fire. After the fire was extinguished, he entered and discovered several items he had not seen the night before: a 20-gauge shotgun shell, two .38 caliber bullets, a package of Kool cigarettes, a roll of five $10 bills, two high school identification cards belonging to Claudell, and a wallet containing the driver's license of defendant Vincent Louis, who is the brother of Claudell and Basil.

About 10 a.m. on the same day Detective Spillman of the Monrovia Police Department, who was assigned to investigate the robbery, went to the Owl Garage to inspect the van and determine the cause of the fire. In carrying out this task, he found and seized, among other things, the wallet with defendant's driver's license (which Officer Hedrich had seen but not removed) and four live Remington-Peters No. 4 shot 20-gauge shotgun shells. While at the lot, Spillman was approached by Claudell, Johnson, defendant—who was wearing a black western-style shirt with white pearl buttons—and two other persons. Claudell demanded the van be returned to him; Spillman refused. Before the confrontation was over, Spillman arrested Johnson for the robbery at the gasoline station. Claudell, defendant, and the two other persons drove away in a green and white Lincoln Continental registered to Claudell.

Between 11 and 11:30 p.m. on the same day, a light blue mid-1960's Plymouth containing three men entered the USA gasoline station at a high rate of speed; one of the passengers was wearing a white cap. The car proceeded directly to the cashier's booth, where Walker, the attendant, was standing. After someone in the automobile said something about "cigarettes," Walker approached and leaned over on the driver's side. A shot was fired, the car sped away, and Walker lay dead of a wound to the head inflicted by a Remington-Peters No. 4 shot 20-gauge shotgun shell.

About the same time Deputy Baltazar of the Los Angeles Sheriff's Department went to a vacant lot approximately one mile from the gasoline station in response to information that there was suspicious activity at a nearby school. At the lot he discovered a green and white Lincoln Continental. Deputy Sabalone, who had responded to Baltazar's request for a backup, felt the hood and found the engine still warm. The deputies withdrew and established surveillance over the vehicle. About 11:20 p.m., Sabalone saw two persons run from the car. The headlights went on, the car started to move, and Baltazar began his pursuit. During the chase, the Lincoln attempted to ram the police vehicle. Baltazar observed that the driver wore a light or cream-colored cap and that the sole passenger also wore a cap. He lost sight of the car for a second or two; when he saw it again, it was sitting abandoned with headlights on, engine running, and door open. He searched the interior and trunk of the car, found nothing of relevance to this case, and had the vehicle impounded at Ken's Towing.

The impounded car was Claudell's green and white Lincoln Continental. Between May 23 and May 27 Detective Spillman questioned Claudell on several occasions. On May 23 Claudell told Spillman the car had been stolen. Subsequently he made two attempts to have the police release the vehicle; on each occasion they refused because they had not finished their

investigation. On May 27 Claudell again sought the release of the car; Spillman refused on the ground he had not yet conducted a search; Claudell gave him permission to do what he had to in order to expedite the release; Spillman immediately searched the vehicle and found a black western-style shirt with white pearl buttons on the front seat and a sawed-off 20-gauge shotgun and two live Remington-Peters No. 4 shot 20-gauge shotgun shells in the trunk. It was later determined that the shotgun and other weapons, including a Smith & Wesson .32-.20 caliber revolver and an Iver-Johnson .38 caliber revolver, had been stolen in a 1977 burglary, and that a group comprising Claudell and others was suspected of having committed the crime.

On June 13 Spillman went to Claudell's house—where defendant apparently was living—conducted a search, and found the Smith & Wesson .32-.20 caliber revolver and the Iver-Johnson .38 caliber revolver that had been stolen in the 1977 burglary with the 20-gauge shotgun recovered from the trunk of Claudell's car.

On June 18 a complaint was filed against Claudell, Basil, Johnson, Ates, and defendant. As later amended, it charged the murder of Walker on May 12, 1980 (Pen. Code, § 187), conspiracy to commit murder (*id.*, §§ 182, 187), the robbery of Walker on May 10, 1980 (*id.*, § 211), and conspiracy to commit robbery (*id.*, §§ 182, 211); as a special circumstance it alleged that after the robbery occurred each of the defendants committed, or aided or abetted in the commission of, the murder of Walker to prevent him from testifying (*id.*, § 190.2, subds. (a)(10), (b)). Soon after the filing of the complaint all the persons charged, with the exception of defendant, were in custody. Trial was set to begin against Claudell, Basil, Johnson, and Ates in February 1981.

In November 1980 defendant was arrested. At his preliminary hearing, held in January 1981, one Gregory Tolbert was among the witnesses testifying for the prosecution. His testimony—which plays a crucial role in this appeal—was in substance as follows.

In May 1980 Tolbert was living with his girlfriend Sheila Ates, Vincent Ates's sister, at her apartment. A day or two after the robbery on May 10, Claudell, Basil, defendant, and possibly Johnson and another Louis brother came to the apartment. While he sat in the bedroom watching television, through a half-open door he heard the visitors talk about the robbery, the arrest of Vincent Ates, their need for a car, and Walker, the witness to the robbery; he also heard defendant say that Walker had identified Ates and would have to be "taken out of the box," and that they "needed a car quick." The next day, May 11, Claudell and defendant again visited the apartment. Again from the bedroom he overheard a discussion about John-

son's arrest and a statement by Claudell to the effect that the van had been burned in order to destroy something inside. After the murder on May 12 defendant came to the apartment a third time and told him, "I took [the attendant] out."

Tolbert's testimony, however, was not immune to challenge. Significant internal inconsistencies were evident. Initially, he claimed he could attribute certain statements to defendant on the first visit to the apartment even though he overheard the conversation from another room as he was watching television, and had previously seen defendant on only a few occasions and had never engaged in more than a brief exchange of greetings with him. Second, at one point he declared that Vincent Ates was present during the first visit; Ates, however, had already been arrested for the robbery and was in custody. Finally, as to the last visit, during which defendant allegedly admitted killing Walker, he first testified that defendant came the day after the murder and that he (Tolbert) had let him in, but then testified that defendant had come several days after the incident and had let himself in.

Further, Tolbert made certain important admissions on the stand. He testified he had incriminated the Louises in statements to Detective Spillman. Under cross-examination, however, he conceded that while in custody in August 1980 on charges of grand theft, he told an investigator for Claudell's attorney that he had not heard any of the Louises' conversations inside the apartment. He also admitted that he wrote a letter to the attorney stating he had falsely incriminated the Louises to Detective Spillman to protect himself and Sheila Ates from arrest apparently in connection with the USA gasoline station robbery and murder. He later said, however, that he had lied in his statement to the investigator and in the letter—but not in his statements to the police—and had done so because he was intimidated by the investigator and believed incriminating the Louises would place his life at risk.

Finally, Tolbert admitted that he had used many aliases, that he had been in custody several times since August 1980, and that on three occasions after he was released he left town, failed to make required court appearances, and had to be arrested on bench warrants in order to be brought to court. He also admitted that he had been convicted of several felonies, including grand theft, receiving stolen property, and burglary, and that he was then in custody on a theft-related felony.

In February 1981, after the preliminary hearing, an information was filed charging defendant with murder and conspiracy to commit murder and alleging as a special circumstance the intentional killing of a witness.

In the same month the trial against Claudell, Basil, Johnson, and Ates began. Tolbert was still in custody on felony charges. In order to induce

him to testify, the prosecutor agreed to recommend that after completing his testimony he be released on his own recognizance to spend the weekend with an unnamed friend at an undisclosed address before he was scheduled to appear for sentencing. With the addition of a statement that he saw the Louises in a light blue Plymouth the day before the murder, Tolbert's trial testimony followed in substance the testimony he gave at defendant's preliminary hearing; it did not include, however, defendant's alleged admission to him that he killed the attendant. On the robbery-related charges, the jury found the four defendants guilty; on the murder-related charges, however, they found Ates not guilty and were unable to reach a verdict as to the three others, and the court declared a mistrial.

The retrial of the charges against Claudell, Basil, and Johnson was consolidated with the case against defendant; all were tried under an amended information charging murder and conspiracy to commit murder and alleging as a special circumstance the intentional killing of a witness. The prosecution elected to seek the death penalty against defendant alone. Two juries were empanelled to sit simultaneously—jury No. 1 to decide defendant's case, and jury No. 2 to decide that of the others.

After testifying at the first trial of Claudell, Basil, and Johnson, Tolbert had been released on his own recognizance in accordance with the terms of his agreement with the prosecution, and had promptly disappeared. Under Evidence Code section 1291 the prosecution successfully moved the court to admit the testimony Tolbert gave at the first trial into evidence against Claudell, Basil, and Johnson, and his testimony at the preliminary hearing into evidence against defendant.

The prosecution's theory was that Claudell, Basil, Ates, Johnson, and defendant plotted the robbery some days before it occurred; in the two days following the identification of Ates by the gasoline station attendant and his arrest, Claudell, Basil, Johnson, and defendant planned the murder of the attendant to prevent him from testifying against Ates; and pursuant to the plan defendant carried out the killing.

With the exception of Tolbert's testimony at defendant's preliminary hearing, which was admitted against defendant alone, the prosecution presented substantially the same evidence against all four defendants. Three prosecution witnesses gave testimony about the statements and conduct of the defendants around the time of the incidents in question: Joseph Lane, Phillip Lowden, and through the transcript of his prior testimony, Tolbert. Each of the defendants attempted to undermine the value of this testimony.[1]

---

[1]Defendant also presented evidence, through his own testimony and that of his friend Larry Shipp, that he was not at the USA gasoline station when either the robbery or the murder was committed.

Lane, who operated an antique car business out of his house, testified he had known Johnson, Ates, and the Louis family for several years. Between 3:30 and 5 p.m. on May 12, 1980, Claudell, Basil, and defendant visited him at home and inquired whether he had any cars to sell. He said no. Before leaving, they told him Johnson had been arrested and asked for his assistance in posting bail. Twice during the evening of the same day defendant returned to discuss Johnson's bail; each time he was accompanied by a person who was outside Lane's range of vision but may have been one of the Louis brothers. Between 7 or 8 p.m. and 11 p.m. defendant and his companion left for the last time; about 10 or 15 minutes later, he heard a loud noise, as of a gunshot, firecracker, or backfire, coming from the direction of the USA gasoline station, approximately eight blocks away. About a week later he went to defendant's house and saw in the garage a car he believed to be blue.[2]

Lane's testimony, however, was unsure and inconsistent in a number of particulars. His recollection of the meetings on May 12, the day of the killing, was evidently hazy. He was uncertain, for example, whether he ever saw Claudell after the first conversation in the afternoon and when he last spoke with any of the Louises during the evening. Moreover, he testified at one point that the meetings took place on May 11 and at another that they took place on May 13.

Lowden testified that he was acquainted with Claudell, Basil, Johnson, Ates, and defendant from the community, and that although he could not recall specific times and places he believed he had seen defendant in the area during 1975, 1976, 1979, and 1980. He had formerly worked at the USA gasoline station in Monrovia and had been convicted of committing a robbery at a USA station in Pomona. A couple of days before May 10, 1980, he encountered defendant, who asked if he would help rob the Monrovia station; he refused out of fear of violating the terms of his probation. Sometime later in the day, he had a discussion with Claudell, Basil, Johnson, Ates, and defendant at a park called "the Plunge." Again defendant asked if he would help; again he said no. Defendant then requested specific information about the station in order to develop a plan, and he may have given some. The job was then sketched out for him: defendant said Ates would commit the robbery and he would assist by pulling a gun on the attendant; Ates and defendant stated that they would drive into the station, pull a gun on the attendant, take the money, and run; Johnson said she would assist by waiting in the van around the corner from the station and

---

[2]In the presence of jury No. 1 alone Lane testified that on the day after the killing he and Sheila Ates and defendant spoke; Sheila asked defendant whether he had heard of the killing, defendant said yes and then walked away with her; later defendant told Lane to say to anyone who asked that he (defendant) had been alone when he visited him the night before.

then driving Ates and defendant away; Claudell and Basil stated they would act as lookouts and would distract the attention of any witnesses; Basil and defendant said they would shoot the attendant if anything went wrong.

Lowden further testified that on May 11 Johnson described the robbery to him, told him of Ates's arrest, and said that although they had thrown away the gun Ates had used, the money and cigarettes taken in the robbery and some bullets and shells were still in the van. Later that day, he talked with Claudell, Basil, Johnson, and defendant at the Plunge. Defendant narrated the events of the night before, as did Claudell and Basil. Johnson stated that before his arrest Ates said the attendant should be killed because he could identify him. Defendant said that Ates could implicate them all and therefore they would have to follow his advice. Claudell agreed, as did Basil. At one point Claudell, Basil, Johnson, and defendant each stated that he would personally shoot the attendant. Defendant suggested that they drive into the station, do the deed, and drive out. Claudell said he would simply go up and shoot the attendant. Basil recommended that they kill him at his home or at a bar. Defendant debated whether or not the killing should be done at the station. Claudell suggested that a .38 caliber revolver be used and that a 12-gauge shotgun be employed as a backup if needed.

The credibility of Lowden's testimony was undermined by internal inconsistencies and conflicts with undisputed facts. First, his claim that he knew Claudell, Basil, Johnson, Ates, and defendant, was in serious dispute. He was unable to identify any occasion on which he had seen any of them in the three years before May 1980. That he was acquainted with defendant appeared especially open to question: he testified he believed he had seen defendant in the community several times during 1976 and 1979, but in fact defendant was incarcerated between April 1976 and early 1980; moreover, although he quickly identified Claudell, Basil, and Johnson in open court, he hesitated about 30 seconds before identifying defendant. Second, in recounting the foregoing conversations he gave inconsistent accounts of their contents and participants. For example, he initially testified that in the May 11 meeting at the Plunge Claudell, Basil, Johnson, and defendant each said that the USA gasoline station attendant had to be killed and then discussed how the killing should be done and by whom; later, however, he partially recanted his testimony and stated that although Basil was in the park he was not close enough to join in the conversation.

Lowden's credibility was put into question by several extrinsic factors as well. First, he had been convicted not only of the robbery of the Pomona USA gasoline station but also of forgery. Second, he admitted that his memory was poor and that he had been drinking or smoking marijuana or both during most of the conversations he described. Finally, he conceded

that his willingness to testify was motivated in part by the expectation that he would receive at least some of a $10,000 reward offered by USA if the defendants were convicted.

Tolbert's testimony at defendant's preliminary hearing was read to jury No. 1, which was hearing the case against defendant. Without waiving his objection to the admission of this evidence, defendant's counsel stipulated that Tolbert's testimony at the first trial of Claudell, Basil, and Johnson could also be read—evidently because Tolbert was subjected to more rigorous and thorough cross-examination at the first trial than he was at the preliminary hearing.[3]

The prosecution presented its case not only through the testimony of witnesses but also by physical evidence, especially the 20-gauge shotgun and Remington-Peters No. 4 shot 20-gauge shotgun shells found in the trunk of Claudell's Lincoln Continental. The defendants endeavored to show this circumstantial evidence was weak and not consistent only with their guilt.

First, it could not be proved that the physical evidence was connected with the killing. Laboratory tests failed to establish that the shotgun was the murder weapon. Indeed, the sequence of events around the time of the incident suggest that the shotgun was not used in the killing: the Lincoln Continental was under watch from before the time the shooting occurred; the surveillant police officers apparently did not observe the trunk open; and in the one or two seconds during which the fleeing vehicle was out of Deputy Baltazar's sight there was evidently no time for the occupants to put the shotgun into the trunk and then make off into the night. Moreover, defendant's black western-style shirt, which was found on the front seat, did not reveal any gunpowder residue of the sort that would have been present had its wearer fired a shotgun or been near someone who had.

Second, it could not be demonstrated that any of the defendants was connected with the physical evidence on the night in question: no fingerprints of the defendants were found on the shotgun, the shells, or the car; fingerprints were in fact found in the vehicle, but they did not belong to any of the defendants.

After the consolidated trial jury No. 1 returned guilty verdicts against defendant on both the murder and conspiracy counts, and found the special circumstance allegation to be true. Jury No. 2, by contrast, returned not

---

[3]At trial the prosecution also called one David Farnam, who testified that together with Claudell and others he stole the 20-gauge shotgun, Smith & Wesson .32-.20 caliber revolver, and Iver-Johnson .38 caliber revolver seized in this case, and that Claudell kept these weapons.

guilty verdicts against Basil and Johnson on both the murder and conspiracy counts, and were unable to reach a verdict against Claudell on either. The court declared a mistrial as to him and dismissed the information with prejudice.

At the penalty phase jury No. 1 imposed on defendant the sentence of death.

## I .

Defendant contends the court committed prejudicial error in allowing the prosecution to use Tolbert's preliminary hearing testimony against him at the trial. The contention is supported by settled law, and on the facts of this case the error must be deemed prejudicial.

## A

Under both the federal and state Constitutions a criminal defendant is guaranteed the right to be confronted with the witnesses against him. (U.S. Const., 6th Amend.; *Pointer* v. *Texas* (1965) 380 U.S. 400, 403-405 [13 L.Ed.2d 923, 926-927, 85 S.Ct. 1065] [holding the confrontation clause applicable to the states]; Cal. Const., art. I, § 15.) This right is confirmed in Penal Code section 686, which provides in relevant part that "[i]n a criminal action the defendant is entitled . . . to be confronted with the witnesses against him, in the presence of the court . . . ."

The primary purpose of the constitutional guarantee is to ensure that the defendant is able to conduct a "personal examination and cross-examination of the witness, in which [he] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." (*Mattox* v. *United States* (1895) 156 U.S. 237, 242-243 [39 L.Ed. 409, 411, 15 S.Ct. 337]; accord, *California* v. *Green* (1970) 399 U.S. 149, 158 [26 L.Ed.2d 489, 497, 90 S.Ct. 1930]; *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738]; *In re Terry* (1971) 4 Cal.3d 911, 922 [95 Cal.Rptr. 31, 484 P.2d 1375]; *People* v. *Green* (1971) 3 Cal.3d 981, 989 [92 Cal.Rptr. 494, 479 P.2d 998].) Thus, "one of the important objects of the right of confrontation was to guarantee that the fact finder had an adequate opportunity to assess the credibility of witnesses." (*Berger* v. *California* (1969) 393 U.S. 314, 315 [21 L.Ed.2d 508, 510, 89 S.Ct. 540].)

The fundamental character of this right is beyond question. (*People* v. *Stritzinger, supra,* 34 Cal.3d at p. 515.) As the United States Supreme Court

has stated, "There are few subjects, perhaps, upon which [it] and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." (*Pointer* v. *Texas, supra,* 380 U.S. at p. 405 [13 L.Ed.2d at p. 927].) Any denial or significant diminution of this right deprives the accused of an essential means to test the credibility of his accusers and thus "calls into question the ultimate '"integrity of the fact-finding process"'. . . ." (*Chambers* v. *Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 309, 93 S.Ct. 1038]; see *In re Montgomery* (1970) 2 Cal.3d 863, 867 [87 Cal.Rptr. 695, 471 P.2d 15].)

■ "Of course, the right to confront and to cross-examine is not absolute . . . ." (*Chambers* v. *Mississippi, supra,* 410 U.S. at p. 295 [35 L.Ed.2d at p. 309]; accord, *Barber* v. *Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 258, 88 S.Ct. 1318]; *People* v. *Stritzinger, supra,* 34 Cal.3d at p. 515; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) "[T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." (*Barber* v. *Page, supra,* at p. 722 [20 L.Ed.2d at p. 258]; accord, *People* v. *Stritzinger, supra,* at p. 515; *People* v. *Enriquez, supra,* at p. 235.) This exception, however, must be narrowly construed: "The ability of the fact finder to evaluate a witness's credibility is severely hampered when such witness is absent and when his prior testimony is read into evidence. [Citation.] Only if the necessity . . . is clearly demonstrated may the defendant's right of confrontation be overcome . . . ." (*In re Montgomery, supra,* 2 Cal.3d at p. 867.)

■ In accordance with these constitutional principles the statutory law of this state permits a prosecutor to offer the prior testimony of a witness against a criminal defendant only if he carries the twofold burden of establishing the unavailability of the witness and the reliability of the testimony. (Pen. Code, § 686; Evid. Code, § 1291, subd. (a)(2).) The witness is deemed "unavailable" if he is "[a]bsent from the hearing and the proponent of his . . . statement has exercised reasonable diligence but has been unable to procure his . . . attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) The testimony is deemed "reliable" if "[t]he party against whom [it] is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (*Id.,* § 1291, subd. (a)(2).)

B

At the threshold we are confronted with the issue of what standard we should use in reviewing the ruling that admitted Tolbert's preliminary hearing testimony at defendant's trial. Defendant urges that we independently review the matter, the Attorney General that we restrict our scrutiny to the question whether the court abused its discretion. Defendant's position, as we shall explain, is more persuasive.

We recognize that in *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], and its predecessors we held that "due diligence is a factual question . . . [and that] under familiar rules the trial court's ruling will not be disturbed unless an abuse of discretion appears." (*Id.* at p. 312.) Nevertheless, we believe that discussions of analogous questions by this court and the Ninth Circuit Court of Appeals in the six years since *Jackson* justify our reexamination of this issue.

 Properly considered, due diligence in procuring a witness'ss attendance appears to be a mixed question of law and fact. Mixed questions are those "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant legal] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." (*Pullman-Standard* v. *Swint* (1982) 456 U.S. 273, 289, fn. 19 [72 L.Ed.2d 66, 80, 102 S.Ct. 1781].) Under this definition fall such questions as whether there were exigent circumstances to justify a warrantless search (*United States* v. *McConney* (9th Cir. 1984) 728 F.2d 1195, 1199-1204 (in bank), cert. den., 469 U.S. 824 [83 L.Ed.2d 46, 105 S.Ct. 101]), and whether there was founded suspicion to support an investigative stop (*United States* v. *Maybusher* (9th Cir. 1984) 735 F.2d 366, 371, fn. 1, cert. den. (1985) 469 U.S. 1110 [83 L.Ed.2d 783, 105 S.Ct. 790]). Under it appears to fall as well the question of due diligence: in addressing it the court must also determine the underlying facts, select the applicable legal standard, and apply the latter to the former.

 The proper standard for mixed questions appears to be independent review. We clearly implied as much in *People* v. *Leyba* (1981) 29 Cal.3d 591 [174 Cal.Rptr. 867, 629 P.2d 961]. There, without using the term "mixed question," we analyzed the scope of an appellate court's review of the trial court's determination of such a question—in that case specifically the reasonableness of an investigative stop. In considering a question of this kind, we explained, the trial court must engage in a two-step process, each step of which is subject to a different standard of review.

"In the first step the trial court must 'find the facts' relating to the [issue at hand]. These are traditional questions of fact, and the statute vests the

superior court with the power to decide them. [Citation.] Accordingly, . . . for the purpose of finding those facts 'the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.'

"No less important, however, is the second step of the process. . . . 'The trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the meaning of the Constitution.' [Citation.] Because 'that issue is a question of law,' the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. Rather, . . . in such review it is 'the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard . . . .' [Citation.] On that issue, in short, the appellate court exercises its independent judgment." (29 Cal.3d at pp. 596-597.)

We reach the same conclusion if we follow a slightly different and longer road. In *United States* v. *McConney, supra,* 728 F.2d 1195, the Ninth Circuit Court of Appeals, sitting in bank, reconsidered the proper standard of review for the issue of exigent circumstances, and developed the following analysis—based on principles analogous to those of our own jurisprudence—as a guide to selecting a standard for that and other mixed questions.

■ "[T]here are three distinct steps in deciding a mixed fact-law question. The first step is the establishment of the 'basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators . . . ."' [Citations.] The second step is the selection of the applicable rule of law. The third step—and the most troublesome for standard of review purposes—is the application of law to fact or, in other words, the determination 'whether the rule of law as applied to the established facts is or is not violated.' [Citation.]

"The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review. The appropriate standard of review for the first two of the . . . court's determinations—its establishment of historical facts and its selection of the relevant legal principle—has long been settled. Questions of fact are reviewed under the deferential, clearly erroneous standard. [Citation.] Questions of law are reviewed under the non-deferential, de novo standard. [Citations.] These established rules reflect the policy concerns that properly underlie standard of review jurisprudence generally.

■ "[The] mandate that appellate courts not disturb a trial court's findings of fact unless clearly erroneous serves two policy objectives. First, it minimizes the risk of judicial error by assigning primary responsibility for resolving factual disputes to the court in the 'superior position' to evaluate and weigh the evidence—the trial court. . . . Second, because under the clearly erroneous test, the reviewing court will affirm the trial court's determinations unless it 'is left with the definite and firm conviction that a mistake has been committed,' [citation], it is relieved of the burden of a full-scale independent review and evaluation of the evidence. Consequently, valuable appellate resources are conserved for those issues that appellate courts in turn are best situated to decide.

■ "The converse rule—that conclusions of law are subject to plenary or de novo review—reflects similar concerns. Structurally, appellate courts have several advantages over trial courts in deciding questions of law. First, appellate judges are freer to concentrate on legal questions because they are not encumbered, as are trial judges, by the vital, but time-consuming, process of hearing evidence. Second, the judgment of at least three members of an appellate panel is brought to bear on every case. It stands to reason that the collaborative, deliberative process of appellate courts reduces the risk of judicial error on questions of law. Thus, de novo review of questions of law, like clearly erroneous review of questions of fact, serves to minimize judicial error by assigning to the court best positioned to decide the issue the primary responsibility for doing so.

"De novo review of questions of law, however, is dictated by still another concern. Under the doctrine of stare decisis, appellate rulings of law become controlling precedent and, consequently, affect the rights of future litigants. Rulings on factual issues, on the other hand, are generally of concern only to the immediate litigants. From the standpoint of sound judicial administration, therefore, it makes sense to concentrate appellate resources on ensuring the correctness of determinations of law.

"Thus, we have a well developed standard of review jurisprudence for issues of fact and issues of law. Yet, when we review the third of the [trial] court's determinations—its application of law to fact—we confront 'a much-mooted issue' . . . . We believe, however, that the well developed jurisprudence relating to questions of pure law and pure fact offers guideposts for working our way out of this confusion.

"The appropriate standard of review for a [trial] judge's application of law to fact may be determined, in our view, by reference to the sound principles which underlie the settled rules of appellate review just discussed. If the concerns of judicial administration—efficiency, accuracy, and pre-

cedential weight—make it more appropriate for a [trial] judge to determine whether the established facts fall within the relevant legal definition, we should subject his determination to deferential, clearly erroneous review. If, on the other hand, the concerns of judicial administration favor the appellate court, we should subject the [trial] judge's finding to de novo review. Thus, in each case, the pivotal question is do the concerns of judicial administration favor the [trial] court or do they favor the appellate court.

"In our view, the key to the resolution of this question is the nature of the inquiry that is required to decide 'whether the rule of law as applied to the established facts is or is not violated.' [Citation.] If application of the rule of law to the facts requires an inquiry that is 'essentially factual,' [citation]—one that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,' [citation]—the concerns of judicial administration will favor the [trial] court, and the [trial] court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

"As the Supreme Court appeared to indicate in *Pullman-Standard* [v. *Swint*], 456 U.S. [273,] 289 n. 19, 102 S.Ct. [1781,] 1790 n. 19 [(1982)], the concerns of judicial administration will generally favor the appellate court, justifying de novo review. This is so because usually the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles. . . .

"The predominance of factors favoring de novo review is even more striking when the mixed question implicates constitutional rights. In cases involving such questions, the application of law to fact will usually require that the court look to the well defined body of law concerning the relevant constitutional provision. Thus, the Supreme Court has held that the mixed question of probable cause is treated as a question of law and reviewed de novo. *See, e.g., Ker* v. *California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). This holding implicitly recognizes that the inquiry involved in applying the probable cause standard goes well beyond the facts of the case and requires consideration of the abstract legal principles that inform constitutional jurisprudence." (728 F.2d at pp. 1200-1203, fns. omitted.)[4]

---

[4]The *McConney* court recognized that "[t]here are . . . some types of mixed questions that are exceptions to [the general rule of] de novo review." (*Id.* at p. 1203.) It identified two. "First, there are those mixed questions in which the applicable legal standard provides for a strictly factual test, such as state of mind, and the application of law to fact, consequently, involves an 'essentially factual' inquiry. [Citation.] In *Pullman-Standard,* for example, the

Applying the *McConney* functional analysis to the case at hand, it appears that the issue of due diligence in procuring a witness's attendance is subject to independent review. In the words of *McConney,* "to decide if the facts satisfy the legal test of [due diligence] . . . necessarily involves us in an inquiry that goes beyond the historical facts. [¶] The mixed question of [due diligence] is rooted in constitutional principles and policies. Like many such mixed questions, its resolution requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests. . . . [¶] This is a question that no amount of factfinding will answer. . . . [¶] When, as here, the application of law to fact requires us to make value judgments about the law and its policy underpinnings, and when, as here, the application of law to fact is of clear precedential importance, the policy reasons for de novo review are satisfied and we should not hesitate to review the [trial] judge's determination independently." (728 F.2d at p. 1205, fns. omitted.)[5]

## C

■ Although there is considerable merit to defendant's contention that we should scrutinize the court's ruling under the independent review stan-

---

mixed question before the Court was whether the established facts demonstrated the intent to discriminate required by section 703(h) of title VII of the Civil Rights Act of 1964. Since, for the purposes of section 703(h) of title VII, intent means subjective intent, the relevant legal standard was that of 'actual motive.' [Citation.] The Court distinguished this legal standard from 'some *legal concept* of discriminatory intent,' [citation], noting that actual motive 'appears . . . . to be a pure question of fact,' [citation]. On this basis, the Court concluded that in the case before it the concerns of judicial administration favored the [trial] court and that the mixed question under consideration thus '[was] not . . . a mixed question of law and fact of the kind that in some cases may allow an appellate court to review the facts.' [Citation.] The Court subjected the lower court's determination to clearly erroneous review.

"A trial court's determination whether established facts constitute negligence offers us a second situation in which the concerns of judicial administration favor the [trial] court. *Because the legal standard for judging whether conduct is negligent requires us to determine,* by reference to the 'data of practical human experience,' [citation], whether an individual acted 'reasonably' by community standards, the trial court's findings of fact effectively determine our legal conclusion. Consequently, clearly erroneous review is appropriate." (*Id.* at pp. 1203-1204, fn. omitted.)

Plainly, the issue of due diligence comes within neither of these exceptions. It is not a question that involves "an 'essentially factual' inquiry," like that of whether a person had an "actual motive" to discriminate. Nor can it be answered, as can the question of negligence, "by reference to the 'data of practical human experience'" and in accordance with "community standards"; rather, it requires consideration of constitutional principles and policies.

[5]The Attorney General argues that the existence of due diligence is a question of fact and as such is subject to review under the abuse of discretion test. Specifically, he asserts that in deciding the issue the trial court makes only a factual determination and applies no legal standard to the facts found. The point is without merit. Whether or not the prosecution has exercised due diligence must, of course, be decided on the specific facts of the individual case—but also, and necessarily, within the context of the defendant's right to confrontation and its underlying policies.

dard, we need not resolve the issue; under any standard, the admission of Tolbert's preliminary hearing testimony at defendant's trial was error.

There was no witness whose testimony was more critical to the prosecution's case against defendant than Tolbert. In fact, the sole evidence identifying defendant as the trigger man came from him. The prosecutor candidly conceded the point. At the section 1291 hearing, in response to a question whether prior to the first trial against Claudell, Basil, and Johnson he thought there was a "very strong possibility" the jury would hang, he stated: "There's—first, as a general principle there is always the possibility of a hung jury. [¶] Second, due to the nature of the evidence in this case, I—although I don't have a distinct recollection of having thought in those terms, I'm sure that I did consider that at some point in time. [¶] What I was most concerned about and that I do have a distinct recollection about is my concern that I couldn't insure the—*I wanted to do whatever I could to insure that [Tolbert] would testify against [defendant], because it was his testimony and his testimony alone which enabled us to identify [defendant] as the shooter in this case, and that's a man that I was concerned about prosecuting from the outset.*" (Italics added.) In his argument he made his admission clearer still by characterizing Tolbert's testimony as "the kind of testimony . . . that is just vital, that you have to have . . . ."

There was also, however, no witness whose credibility was more suspect than Tolbert. At all times relevant here, it was known by the parties and the court that Tolbert had been convicted of several felonies, including burglary, grand theft, and receiving stolen property; that he had been committed to a hospital for the criminally insane; that he had used nine or ten aliases over a long and varied criminal career; that he habitually failed to make court appearances and had to be arrested to compel his attendance; and that he apparently had some expectation of receiving a reward if the defendants were convicted as a result of his testimony. For these reasons the trustworthiness of Tolbert and his testimony was recognized by all to be open to serious question. The prosecutor admitted that Tolbert was "flaky." The court characterized him as "obviously a highly unreliable witness, a man of many names, a man with many arrests, a man who had avoided the service [of process]," and expressed its opinion that he was "one of the flakiest, most unreliable witnesses that the court has come in contact with." Tolbert, in short, was precisely the type of witness that a jury needs to scrutinize in person in order to intelligently evaluate his credibility and the truth or falsity of his testimony. The court acknowledged as much by observing, "I'd like to have the defendants have the benefit of [Tolbert's] testimony. As I say, I think he would probably not look as good in person as he does in reading out of the transcript."

Before the first trial against Claudell, Basil, and Johnson began in February 1981, Tolbert, who was in custody apparently facing charges on one theft-related felony and awaiting sentencing on another, had refused the prosecution's request to testify. Claiming that the Louises had threatened him with harm if he incriminated them in the Walker murder and that the authorities could not provide him with sufficient protection in custody, Tolbert told the prosecution he would take the stand only if after testifying he was released on his own recognizance to spend the weekend between the end of his testimony and his scheduled sentencing hearing with an unnamed friend at an undisclosed address. The prosecutor believed that Tolbert's testimony was "vital" to his case. He also believed that unless he acceded to the demand Tolbert would persist in his refusal to testify. The deal was struck. Tolbert testified on March 4 and 5; he was released apparently on March 6, he was told to report his whereabouts to the police on the next day—the authorities evidentally never made any effort at all to determine the name of Tolbert's friend or his address; he was also told to appear for sentencing on March 9; except on one occasion about a month later, he was never seen or heard from again.

At the hearing on the motion to admit Tolbert's preliminary hearing testimony, the prosecution attempted to carry its twofold burden of justification by presenting evidence and argument that (1) Tolbert should be deemed unavailable because both the agreement to release him and the efforts to locate him after his disappearance were reasonable, and (2) defendant had the right and opportunity to cross-examine him with an interest and motive similar to those he had at trial. Although recognizing that defendant's position was "strong" and the issue was "very closely balanced," the court ruled in the prosecution's favor.

■ We have some doubt whether the prosecution carried the second part of its burden. First, at the preliminary hearing defense counsel appears to have cross-examined Tolbert with an interest and motive peculiar to that early stage in the proceedings—viz., to attempt to tie Tolbert down, in the interests of pretrial discovery, to one of at least three different stories he had told the police and others in the case. Second, to the extent counsel sought to conduct a cross-examination similar to what he would have conducted at trial, he was apparently frustrated to a certain extent by restrictions imposed by the magistrate: as the trial court acknowledged, "at the preliminary hearing of [defendant] much of the time was taken up in arguments between [the magistrate] and [defendant's] then counsel. It didn't amount to testimony, it amounted to various types of disagreement."

■ ■ We need not, however, resolve the question whether the prosecution carried the second part of its burden, for it is clear that it failed

to carry the first. "[T]he requirement of due diligence 'is a stringent one for the prosecution. . . .'" (*People* v. *Jackson, supra*, 28 Cal.3d at p. 312.) It is more stringent still when, as here, the absent witness is vital to the prosecution's case and his credibility is suspect. (See *United States* v. *Mann* (1st Cir. 1978) 590 F.2d 361, 367 [construing the similar "unavailability" provisions of Fed. Rules Evid., rule 804(a)(5), 28 U.S.C.].) The obligation to use reasonable means to procure the presence of the witness has two aspects. The more obvious is the duty to act with due diligence in attempting to make an absent witness present. Less obvious, perhaps, but no less important "is the duty to use reasonable means to prevent a present witness from becoming absent." (*Id.* at p. 368.) If the prosecution fails in this latter duty, it does not satisfy the requirement of due diligence. (*Ibid.*)

On the facts of this case, the diligence required of the prosecution to prevent Tolbert from becoming absent was particularly high. Defendant was to go on trial for his life; Tolbert was a critical prosecution witness, and was known to be both unreliable and of suspect credibility—the very type of witness that requires, but is likely not to appear to submit to, cross-examination before a jury.

Even though we have evaluated the prosecution's actions in light of the circumstances as they then appeared and as favorably as the law and the facts allow, we are nevertheless compelled to conclude—not only by the totality of the evidence but especially by the prosecutor's own admissions—that it failed to exercise virtually any effort to prevent Tolbert from becoming absent.

First, the prosecution's dealings with Tolbert had as their single purpose and effect to secure his testimony at the first trial against Claudell, Basil, and Johnson; they were not intended to prevent, and plainly did not prevent, his absence from defendant's trial. As the prosecutor explained, "had we refused to comply with this relatively modest request [for an own-recognizance release] on the part of [Tolbert], we simply would not have had any testimony from him at the [first] trial [of Claudell, Basil, and Johnson]. [¶] I would submit that . . . considering . . . the seriousness of the charges against the defendants that were on trial . . ., that was an unacceptable alternative. . . . [¶] I would submit that . . . where some people are charged with murder and conspiracy to commit murder, [and] you've got a witness who says I heard him say, 'Hey, we're going to take him out of the box' . . . so he can't be a witness against [one of the defendants], or words to that effect, I think that is the kind of testimony . . . that is just vital, that you have to have under those circumstances. [¶] *You can't very well . . . give up that testimony at a trial in progress with the . . . possibility that by giving it up . . . you might be able to use it at a later trial against one*

*defendant. [¶] You have to deal with the realities of the day that are before you, not what might happen . . . at some time in the future. . . . [¶]* I would submit in closing, . . . [that] the decision that I made . . . was the only reasonable decision that I could have made *with respect to getting that witness's testimony before that particular jury.*" (Italics added.)

Second, the prosecution's efforts were not unlikely to lead to Tolbert's absence from his scheduled sentencing hearing and subsequently from any future trial in this matter. At the time of his agreement with Tolbert, the prosecutor testified, he believed Tolbert would appear at the sentencing hearing: Tolbert thought he would be sentenced to time served and released; he admitted, however, "In my mind there was a very real possibility that the man would boogie, that he wouldn't show up. . . . I thought there was a real risk that he would not."[6]

The Attorney General argues, as the prosecutor urged and the court agreed, that the prosecution's agreement to release Tolbert on his own recognizance was a reasonable means to secure his testimony at the first trial against Claudell, Basil, and Johnson. The point is immaterial. The purpose of the due diligence requirement is to ensure that the prosecution has made all reasonable efforts *to procure the presence of the witness* before the defendant is denied the opportunity to confront him. (*Barber* v. *Page, supra,* 390 U.S. at pp. 723-725 [20 L.Ed.2d at pp. 259-260].) Whether reasonable or not in view of some other purpose, the agreement neither was intended, nor did it operate, to prevent Tolbert's absence from defendant's trial. That is the sole issue before us now.

The Attorney General may mean to argue that the prosecution could have taken no steps that might have prevented Tolbert's disappearance or, at least, none that might have both secured his testimony at the first trial *and* prevented his disappearance. If so, he is unpersuasive.

First, the prosecution—at the very minimum—could have attempted to obtain from Tolbert and independently verify the name and address of the friend with whom he allegedly intended to spend the weekend. Further, it could then have arranged that he be kept under surveillance during that period of time. Whether merely obtaining the name and address of the friend would have prevented Tolbert's disappearance seems unlikely. But the failure to take such minimal action plainly conflicts with the claim that the prosecution exercised due diligence. Indeed, such failure suggests indifference

---

[6]The only action the prosecution took that can be characterized as an attempt to prevent Tolbert from becoming absent was to serve him with a subpoena to appear at defendant's trial. In light of Tolbert's undisputed and indisputable unreliability, mere service of process does not and cannot satisfy the requirement of due diligence here.

on the part of the prosecution to the presence of Tolbert at defendant's trial.[7] Also, as the prosecutor himself admitted, to prevent Tolbert from becoming absent the prosecution could simply have invoked the "material witness" provisions of Penal Code sections 879, 881, and 882.[8]

The Attorney General may also mean to argue that if the prosecution could not both secure Tolbert's testimony and prevent his disappearance, its adoption of reasonable means to attain the former goal would exempt it from the requirement of exercising due diligence in attaining the latter. He fails, however, to present either reason or authority to support such a proposition. In any event, the prosecution, as we have shown, did indeed have means at its disposal that might have both secured Tolbert's testimony and prevented his absence.

### D

 "Because this error is of federal as well as state constitutional dimension, violating as it does the defendant's right to confrontation guaranteed by the Sixth Amendment to the United States Constitution, we must apply the reversible error test set out in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. [Citation.] This test provides that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' [Citation.] The burden is on the beneficiary of the error 'either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment.' [Citations.] The *Chapman* court reiterated the approach it adopted in *Fahy* v. *Connecticut* (1963) 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229]: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' [Citations.] Where a fundamental constitutional right is at issue, erroneous evidentiary rulings are seldom harmless under this standard: 'An error in admitting plainly relevant evidence which possibly

---

[7]The prosecution's failure even to attempt to obtain and independently verify the name and address of Tolbert's friend—if such a person indeed existed—may suggest something other than mere indifference. The prosecutor plainly wanted Tolbert's testimony at the first trial against Claudell, Basil, and Johnson, and at defendant's later scheduled trial. He made the agreement for the own-recognizance release to secure Tolbert's testimony at the first trial. He may have taken no steps to prevent Tolbert's disappearance after the first trial because he had the testimony from defendant's preliminary hearing which could be used if Tolbert became unavailable. Indeed, the prosecutor may have taken no steps because he hoped that Tolbert would disappear, since as the court recognized "[Tolbert] would not look as good in person as he does in reading out of the transcript . . . ."

[8]Under sections 879, 881, and 882, a material witness may be incarcerated, subject to certain conditions, to assure his attendance at a hearing or trial.

influenced the jury adversely to a litigant cannot . . . be conceived of as harmless.' [Citation.] Further, we must weigh the impact of the error not only on the decision of the jury, but also on the course of the trial." (*People* v. *Stritzinger, supra,* 34 Cal.3d at p. 520.)

Under the *Chapman* test the error in this case cannot be deemed harmless: "As the evidence disclosed in the prior recorded testimony was critical to the prosecution's case for reasons stated above, the error was clearly prejudicial and the judgment must be reversed . . . ." (*People* v. *Enriquez, supra,* 19 Cal.3d at p. 237.)

The Attorney General asserts that Tolbert's testimony at the preliminary hearing was not critical. The point is without merit.

First, as shown above (Part I C, *ante*), the prosecutor admitted the crucial importance of Tolbert's testimony. Second and more important, the divergent verdicts reveal that Tolbert's testimony at the preliminary hearing must be considered critical. Virtually the same evidence—with the exception of this testimony—was presented against defendant and his codefendants.[9] Yet while defendant was convicted of murder and conspiracy to commit murder, his codefendants were not: the jury acquitted Basil and Johnson outright; they were unable to reach a verdict as to Claudell, and the charges against him were dismissed with prejudice because two juries in two trials had failed to find him guilty. We must therefore conclude that Tolbert's preliminary hearing testimony spelled the difference between conviction and non-conviction—indeed, between life and death—and hence that it was of critical importance to the prosecution's case.[10]

---

[9]Other than Tolbert's preliminary hearing testimony, the only allegedly significant evidence introduced against defendant alone was his request that Lane say to anyone who asked that he (defendant) had been unaccompanied when he visited him the night of the murder. The Attorney General argues in effect that this evidence shows defendant creating a false alibi and thereby undercuts the importance of Tolbert's testimony. We cannot agree. The request does not reveal the creation of a false alibi *for defendant*: Lane testified that defendant did in fact visit him on the night in question. Rather, it suggests the creation of a false alibi *for the unidentified companion*—who may have been Claudell: soon after the murder investigation commenced, Claudell told the police under questioning that he was in San Francisco from May 10 (the day of the robbery) through May 12 (the day of the murder).

[10]It would be improper to speculate that the divergent verdicts reveal not that Tolbert's preliminary hearing testimony was critical, but only that the action of jury No. 2 was somehow "aberrational." It would also be unreasonable to do so: in the first trial, another jury, presented with substantially the same evidence as jury No. 2, acquitted Ates of charges of murder and conspiracy to commit murder and failed to convict Claudell, Basil, and Johnson on either of these charges.

In sum, even if as the Attorney General urges the physical evidence and the testimony of the witnesses other than Tolbert "added up to strong evidence of [defendant's] guilt," the judgment must be reversed. (*People* v. *Powell* (1967) 67 Cal.2d 32, 56 [59 Cal.Rptr. 817, 429 P.2d 137].) "[A]pplying the *Chapman* test to this record, as we must, we are compelled to conclude there is at least a reasonable 'possibility' that the evidence complained of 'might have contributed to the conviction' [citation] and the People have not proved the error to be 'harmless beyond a reasonable doubt' [citation]. Indeed, we have seen how important [Tolbert's testimony] [was] to the People's case, and 'There is no reason why we should treat this evidence as any less "crucial" than the prosecutor—and so presumably the jury—treated it.'" (*Id.* at pp. 56-57.)

"Such prejudice was not dispelled by the fact that defendant[] told [his] stor[y] on the witness stand. As in *People* v. *Spencer* (1967) 66 Cal.2d 158, 169 [57 Cal.Rptr. 163, 424 P.2d 715], 'the record in this case fails to dispel beyond a reasonable doubt the possibility' that defendant['s] testimony might have been impelled by the erroneous introduction of [Tolbert's] statements. In any event . . . defendant, far from admitting his guilt in the courtroom, [denied it] . . . ." (*People* v. *Powell, supra,* 67 Cal.2d at p. 57, fn. 9.)

The judgment is reversed.

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

**GRODIN, J.,** Concurring and Dissenting.—I am more persuaded than Justice Panelli that there may be merit in the majority's suggestion that, once the "historical facts" have been found by the trial court, the determination whether those facts establish "due diligence" is a question to be decided de novo by the appellate court. Although the United States Supreme Court has apparently never explicitly addressed this issue, in *Barber* v. *Page* (1968) 390 U.S. 719, 724-725 [20 L.Ed.2d 255, 260, 88 S.Ct. 1318], and *Ohio* v. *Roberts* (1980) 448 U.S. 56, 74-77 [65 L.Ed.2d 597, 612-615, 100 S.Ct. 2531]—two of its leading decisions in this area—the court undertook its own evaluation of whether the prosecution had adequately established its "good-faith efforts" to secure the presence of the missing witness, and did not simply defer to the lower courts' judgment as to the sufficiency or reasonableness of the prosecution's conduct. While at times it may be difficult to separate disputes over "historical facts" from the ultimate question of "due diligence" or "reasonableness," because any judgment as to the "sufficiency" of the prosecution's efforts is so dependent on constitutional values and will necessarily establish guidelines for prosecutorial behavior in future cases, I think that a strong argument can be made that

this is the type of mixed question of law and fact that, at least in general, should properly be resolved de novo on appeal.

Nonetheless, on the record in this case, I agree with Justice Panelli's conclusion that the prosecution adequately established that it did act reasonably and undertook good-faith efforts to secure the in-court testimony of Tolbert and that the absence of such testimony cannot properly be attributed to a lack of diligence on its part.

To begin with, it should be emphasized that the majority does not claim that the prosecution failed to make a good-faith effort to find Tolbert or to secure his presence at defendant's trial once Tolbert failed to appear at his scheduled sentencing hearing on March 9, 1981. As Justice Panelli notes, in the several months between Tolbert's disappearance and the onset of defendant's trial, the prosecution made extensive efforts to locate Tolbert, distributing hundreds of photographs of him throughout the Bay Area and checking with numerous individuals who might have been able to provide leads to his whereabouts. The majority does not fault the prosecution's efforts in this regard.

Instead, the majority bases its finding of a lack of due diligence solely on the prosecution's decision to accede to Tolbert's demand that he be granted own recognizance release for the weekend of March 7 and 8, 1981, in return for his testimony at the initial trial of the codefendants. The majority suggests in this regard that "the prosecution's dealings with Tolbert had as their single purpose and effect to secure his testimony at the first trial against Claudell, Basil, and Johnson; they were not intended to prevent . . . his absence from defendant's trial." (*Ante,* p. 991.) With all respect, however, I do not believe that the record supports that assertion. As the majority itself notes, the prosecutor explicitly testified in explaining his actions with respect to Tolbert's release that " 'I wanted to do whatever I could to insure that [Tolbert] would testify against [defendant], because it was his testimony and his testimony alone which enabled us to identify [defendant] as the shooter in this case, and that's a man that I was concerned about prosecuting from the outset.' " (*Ante,* p. 989.) Although the prosecutor's immediate concern at that time may have been Tolbert's testimony in the initial trial, the prosecutor apparently believed that if Tolbert's request for a weekend release were not granted, it was unlikely that Tolbert would be willing to testify in either the first or the second trial, even if his actual presence at the two trials was forcibly compelled. Thus, it is not accurate to suggest that the prosecutor sacrificed defendant's right to a fair trial in order to

obtain Tolbert's testimony at the codefendants' trial; in reality, the prosecutor was attempting to ensure that Tolbert would in fact testify in court in both the codefendants' and defendant's trials.[1] Indeed, if the prosecutor had failed to accede to Tolbert's demand, and, as a result, Tolbert had been present but had refused to testify at defendant's trial, defendant would undoubtedly now be arguing that the prosecution failed to exercise due diligence by refusing to do what was necessary to secure Tolbert's testimony.

The majority also appears to suggest that even if the release of Tolbert was reasonable, there still would be an absence of due diligence because of the prosecution's failure "to obtain from Tolbert and independently verify the name and address of the friend with whom he allegedly intended to spend the weekend." (*Ante,* p. 992.) Although the court concedes that it is unlikely that "merely obtaining the name and address of the friend would have prevented Tolbert's disappearance" (*ibid.*), it adds that the prosecution "could then have arranged that [Tolbert] be kept under surveillance during that period of time" (*ibid.*), raising the possibility that the failure to undertake such surveillance itself amounts to a lack of due diligence. The majority, however, cites no authority—and I know of none—which indicates that in order to satisfy either statutory or constitutional "due diligence" requirements, prosecutorial authorities must keep a prospective material witness under constant surveillance pending an upcoming trial. Such a requirement, even if limited to witnesses who are obviously reluctant to appear at trial, would clearly place a tremendous burden on law enforcement resources and would also seriously impinge on the privacy interest of the subject of the surveillance. Although "due diligence" may require that the prosecution make special efforts to keep a relatively "close tab" on a witness like Tolbert, I do not think we can say that the prosecution defaulted in its "good-faith effort" simply because it did not keep him under constant surveillance from the moment he was released from custody. As already noted, as soon as the prosecution learned that Tolbert had not appeared for sentencing after his weekend release, it undertook extensive efforts to find him.

Accordingly, taking into account all of the circumstances in this case, I would conclude that the prosecution established that it exercised due dili-

---

[1] Because the record in this case does not support any suggestion that the prosecutor acted to obtain the testimony of Tolbert at the codefendants' trial at the expense of foregoing Tolbert's presence or in-court testimony at defendant's trial, there is no occasion to decide here how the due diligence concept should be applied in the event of such a conflict. I note, however, that there are often numerous constraints on the actions taken by prosecuting authorities—budgetary constraints, duties with respect to other cases, respect for the rights of material witnesses, etc.—and it may be that the "due diligence" concept should be flexible enough to permit consideration of all the circumstances involved in prosecutorial conduct.

gence with respect to Tolbert and that he was unavailable despite its good-faith efforts to secure his testimony at trial.

PANELLI, J.—I respectfully dissent. In my view, a fair reading of the lengthy record of the actions and efforts of the prosecution to secure witness Gregory Tolbert's presence at defendant's trial amply supports the trial court's finding of due diligence. Moreover, I am not persuaded that we should abandon or depart from our settled and long established standard of review of such rulings. This is particularly so where, as the majority ultimately determines, it makes no difference which standard of review is applied.

With respect to the standard-of-review issue, I note that none of the cases cited by the majority involved the question of whether a showing of due diligence had been made. Apparently even the Ninth Circuit has not yet applied its *McConney* (*United States* v. *McConney* (9th Cir. 1984) 728 F.2d 1195) analysis to that issue, while it has determined the following questions to be essentially factual in nature: Whether a defendant's consent to search was voluntary (*United States* v. *Salvador* (9th Cir. 1984) 740 F.2d 752, 757, fn. 3); whether a defendant's *Miranda* waiver was knowing and voluntary (*United States* v. *Doe* (9th Cir. 1985) 764 F.2d 695, 697); whether a defendant was competent to stand trial (*United States* v. *Lindley* (9th Cir. 1985) 774 F.2d 993); and whether an Internal Revenue Service summons was enforceable (*Ponsford* v. *United States* (9th Cir. 1985) 771 F.2d 1305, 1307-1308). I submit that due diligence is similarly an essentially factual question.

Before the prior testimony of a witness may be introduced the declarant must be unavailable as a witness. (Evid. Code, § 1291.) "'[U]navailable as a witness's means that the declarant is: . . . (5) Absent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process. . . .'" (*Id.,* § 240, subd. (a).) (Italics added.) The determination of "reasonableness" is peculiarly a factual determination since it may be made only after an examination of the specific facts and circumstances presented in the case under review. What is reasonable in one case may not be in another; this determination can only be made on a case-by-case basis. But such statements are not new pronouncements. One need only go back to 1980 where we said: "due diligence is a factual question to be determined by the trial court according to the circumstances in each case; under familiar rules the trial court's ruling will not be disturbed unless an abuse of discretion appears. [Citations.]" (*People* v. *Jackson* (1980) 28 Cal.3d 264, 312 [168 Cal.Rptr. 603, 618 P.2d 149].) The determination is, in many ways, similar to the question of whether certain conduct was negligent—a matter which

the *McConney* court stated was subject to the deferential review standard for factual questions. (728 F.2d at pp. 1203-1204.) Accordingly, I conclude that it is appropriate to apply our abuse of discretion standard to the factual question of due diligence.

I find no abuse of discretion in the trial court's ruling that the prosecution had exercised reasonable diligence to procure Tolbert's presence and testimony. In order to assess the ruling it is necessary to give a detailed description of the evidence presented at the hearing.

Detective Hollis Spillman testified at length about Tolbert's reluctance to testify because of fear for his safety. In June 1980, Tolbert told Spillman he could not testify against any of the defendants because he felt he would be murdered. He neither appeared nor testified at the July 1980 preliminary hearing involving Claudell Louis, Basil Louis, Darlene Johnson and Vincent Ates. When Tolbert was arrested in August 1980 he asked to be segregated from the general jail population because of his fear of being killed. At that time, he told Spillman that he did not appear at the July preliminary hearing because he had heard from his girlfriend Sheila Ates—sister of one of the defendants—that the Louis family had made plans to "eliminate" him. Accordingly, Spillman made arrangements for Tolbert to be placed in "keep away" status in the jail.

In September or October 1980, Spillman learned that Tolbert had been attacked while in jail. Several inmates in the "keep away" section jumped him, beat him and stabbed him with a knife or pencil through the cheek all the way to the mouth. Tolbert said that he thought the attack was due to a contract on him by Claudell Louis. He had heard there was a $20,000 contract out for his death. Spillman was unable to determine whether the Louises were behind the attack.

Defendant's preliminary hearing was held in January 1981. Tolbert testified at that hearing. Before his testimony Tolbert demanded to see Spillman to tell him he was afraid that no matter where he was in county jail he would be killed. Tolbert thought that Claudell Louis' attorney, Robert Filippi, was going to have his food poisoned. Tolbert also said that even though he was in "keep away" status and had an individual cell in the hospital ward, he had left his cell once and had found that Claudell Louis was on the same floor wandering around with no restraints.

During defendant's preliminary hearing, Tolbert told Spillman about a visit from Barry Fisher, an investigator for Attorney Filippi. Fisher had asked Tolbert not to testify and said that "these people have lots of money, they have ways of getting to [him]." He also told him to write a letter to

Filippi saying Tolbert's previous statements were untrue. Spillman confirmed with the sheriff's department that an investigator for the defense had visited Tolbert in jail.

As a result of all of this Tolbert asked Spillman to have him moved from the county jail to the USC Medical Center jail ward where he thought he would be safer. Spillman tried, but was unsuccessful since Tolbert was not ill.

Tolbert was still in jail on other charges when he was scheduled to testify on Wednesday, March 4, 1981, at the murder trial of Claudell Louis, Basil Louis, Darlene Johnson and Vincent Ates. Despite his "keep away" status, when brought to court on March 4, Tolbert was handcuffed to a stairwell next to a common hallway which was used by in-custody inmates (who were not handcuffed) to go in and out of the courtroom. Moreover, Darlene Johnson, a defendant in the case, was handcuffed to a chair only four feet away from Tolbert and talked to him.

When Spillman went to see Tolbert there, Tolbert was very angry and upset and told him he would not testify. Two attorneys, who were appointed to advise Tolbert regarding whether he should testify, told Spillman that Tolbert would testify only if he were given own recognizance (O.R.) release from jail at the end of his testimony and that he would appear in court on the following Monday (Mar. 9, 1981) for sentencing on the charges for which he was incarcerated—either two counts of joyriding or one count of joyriding and one of petty theft. (These charges were pending against Tolbert in Van Nuys.) Tolbert's attorney said he understood Tolbert was to be sentenced to time served and thereafter released.

In addition, Tolbert asked to be relocated at the termination of any sentence which he might receive on March 9. Spillman agreed, made arrangements for Tolbert to be in the witness protection program, and so informed Tolbert.

The Van Nuys court granted Tolbert O.R. release on Friday, March 6. Previously, on March 4 or 5, in the presence of Tolbert's attorneys, Spillman had personally served Tolbert with a subpoena for defendant's trial, which was then set for May 14, 1981. At that time, Tolbert expected to be sentenced to time served and released on Monday. He was warned that he would face more charges if he failed to appear on Monday. He failed to appear for his Monday sentencing hearing.

Spillman began trying to find Tolbert as soon as he learned that he had not appeared. He checked with the police departments and jails in Los Angeles, Oakland and San Francisco. He contacted the Oakland police and asked them to check periodically for Tolbert at Sheila Ates's grandmother's house. In March, they missed him there once by one hour. Oakland police distributed about 600 photos of Tolbert in the Bay Area and kept checking the jails, hospitals and Ates's grandmother's house. Spillman checked at Ates's apartment several times and periodically contacted the bartender whose name Tolbert had given as a contact. He also talked with Tolbert's attorneys. Spillman did not refer to the information on Tolbert's O.R. form because he thought the information would be unreliable due to the fact Tolbert had fled.

The prosecutor testified that when he saw Tolbert on March 4, Tolbert was outraged and felt betrayed. Tolbert did not trust them to assure his safety in jail and absolutely refused to testify unless he was given O.R. Although one of Tolbert's attorneys said he thought Tolbert would get sentenced to time served and released on Monday, the prosecutor thought that Tolbert would spend some additional time in jail.

On March 4, the prosecutor was faced with three alternatives: (1) He could refuse to give Tolbert O.R. and lose his testimony, which he considered vital. He felt there was no way he could force Tolbert to testify, that Tolbert was perfectly willing to sit in jail and refuse to testify. (2) He could give Tolbert O.R. and then invoke the procedures of Penal Code section 879 on material witnesses, but had he done that, "the breach of good faith would have been so gross as to be unconscionable, and I do not know if [*sic*] any judge, which would have enforced the provisions of 879, had I offered the man an O.R., had him testify and then had him placed in custody. It seemed to me that just as alternative No. 1 was a completely unacceptable one, so was alternative No. 2." (3) Give Tolbert the O.R. for the three-day period. The prosecutor considered it possible that Tolbert would skip, but on balance thought the chances were better that he would show up. If he did, and were sentenced to further time, he would be in custody and available for the trial of Vincent Louis which was scheduled for May 14. If, however, Tolbert were given time served, it was a real possibility that he would take advantage of the witness protection program they had discussed with him. And, if Tolbert ran, they would have at least two months to find him for the Vincent Louis trial and they felt they could pick him up as they had on three prior occasions.

The prosecutor described his choice as follows: "On the basis of all of that, it appeared to me that there was no—considering the seriousness of the case, the special circumstances, the death penalty that we were seeking

against Claudell and Basil, there was no reasonable alternative but to afford him the O.R. for that period of time."

The court recognized that the prosecutor had no good choice and concluded that the one made—to grant O.R.—was reasonable under the circumstances. The court also noted that the prosecutor had had Tolbert personally served with a subpoena for the May 14 trial before he was released.

The majority's finding of error rests on its evaluation of the "pre-departure" diligence of the prosecution. The majority concludes the prosecution "failed to exercise virtually any effort to prevent Tolbert from becoming absent." In light of the record, however, that conclusion does not withstand scrutiny. Moreover, I am not convinced that the prosecution should be obligated to prevent the disappearance of a witness and that its failure to do so prevents the use of the witness's prior testimony where there is a showing of good faith and reasonable efforts to produce the witness for trial. More importantly, as the record reveals, the prosecutor was concerned with securing Tolbert's *testimony,* not just his presence at both trials. The prosecutor recognized that Tolbert could simply elect to sit in jail and refuse to testify. It was for that reason that he did not view the material witness provisions (Pen. Code, §§ 879, 881, 882) as a viable approach. Moreover, even if he had attempted to invoke those provisions, the constitutional protection against unreasonable detention of witnesses (Cal. Const., art. I, § 10) would surely have been violated by attempting to hold Tolbert for the two months or more until defendant's trial. (See *In re Jesus B.* (1977) 75 Cal.App.3d 444, 451-452 [142 Cal.Rptr. 197].) Additionally, nowhere in the record is there any evidence to support the assumption that had the O.R. release not been granted, Tolbert's testimony at defendant's trial was assured. In fact, based on the record, it would appear that Tolbert's testimony at defendant's trial was indeed problematic. The irony is that had Tolbert not been released on O.R., and instead had remained incarcerated or reincarcerated, he most likely would not have given testimony. Under those circumstances his refusal to testify would have made him unavailable as a witness, thereby permitting the prosecution to introduce his preliminary hearing testimony. (See *People* v. *Walker* (1983) 145 Cal.App.3d 886, 894 [193 Cal.Rptr. 812].)

The majority concludes that the prosecution's obligation to use reasonable efforts to procure the presence of the witness has two aspects, one of which imposes a "duty to use reasonable means to prevent a present witness from becoming absent." Even if I were to accept this conclusion, in this case I believe the prosecution satisfied any such duty. As I see it, we should review the record to determine whether the prosecution's decision to agree to Tolbert's O.R. release was reasonable *at the time it was made* rather than

by a retrospective evaluation. Next, when Tolbert failed to honor the subpoena, we should examine the record to see whether the prosecution made reasonable efforts to locate Tolbert so as to procure his presence for defendant's trial. My answer to both inquiries would be affirmative. I would therefore support the trial court's determination that the prosecution acted with "reasonable diligence" as required by Evidence Code section 240, subdivision (a).

As the United States Supreme Court stated in *Ohio* v. *Roberts* (1980) 448 U.S. 56, 74 [65 L.Ed.2d 597, 613, 100 S.Ct. 2531]: "The basic litmus of Sixth Amendment unavailability is established: '[A] witness is not "unavailable" for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' [Citations.] [¶] Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness's intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness."

The trial court did not err in admitting Tolbert's preliminary hearing testimony. "Preliminary hearing testimony is presented in open court, in the presence of the defendant, at a time when the defendant is represented by counsel, in a proceeding in which the defendant has both the motive and the opportunity to cross-examine the witness, and the testimony is reported and preserved in a formal court transcript. In these circumstances the introduction of preliminary hearing testimony at trial, when the witness is legally unavailable, does not violate either the hearsay rule (Evid. Code, § 240) or the defendant's constitutional right of confrontation (see *Ohio* v. *Roberts* (1980) 448 U.S. 56; *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930])." (*People* v. *Guerra* (1984) 37 Cal.3d 385, 427 [208 Cal.Rptr. 162, 690 P.2d 635].) Furthermore, as observed in the majority opinion, defendant's counsel also had Tolbert's testimony at the trial of Claudell Louis, Basil Louis, Darlene Johnson and Vincent Ates read to the jury. In that testimony, Tolbert was cross-examined by four lawyers all with the motive and interest to discredit his testimony. Taken together with the cross-examination of Tolbert at defendant's preliminary hearing, the requirements of section 1291 of the Evidence Code were met.

I would find no violation of defendant's constitutional and statutory right of confrontation.

Lucas, J., concurred.

Respondent's petition for a rehearing was denied March 9, 1987. Racanelli, J.,* and White, J.,* participated therein. Lucas, C. J., and Panelli, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.