Filed 2/23/21  P. v. Taylor CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JAMES ROBERT TAYLOR,<br>    Defendant and Appellant. | A156864<br><br>(Contra Costa County<br>Super. Ct. No. 51805118) |

James Robert Taylor appeals from convictions of willful infliction of corporal injury, battery with serious bodily injury, and false imprisonment by violence.  He contends the trial court erred in admitting the prior testimony of a witness who did not testify at trial, and in giving instructions that allowed the jury to infer guilt from evidence of appellant's prior domestic violence while prohibiting it from using evidence of a third party's prior domestic violence to infer he was the perpetrator of the present offenses.  He also argues two sentence enhancements must be stricken, a point with which respondent agrees.  We will strike the enhancements and otherwise affirm the judgment.

**BACKGROUND**

Meghann Harrington testified that she began an intimate relationship with appellant in July 2017 that became "official" in November.  They argued a lot and had both verbal and physical fights; he had threatened her more

than 50 times and been physically violent with her over a dozen times. In one of the first incidents, appellant threw a "gravel rock" at Harrington that hit the back of her calf and left a bad scar. In August 2017, Harrington and appellant got into an argument while in Modesto with friends. Harrington walked out and appellant had the friends get in the car to find her. She told them she would figure out how to get home herself but appellant pushed her into the backseat of the car, then got in with her and held her legs as the friend drove back to Brentwood. She acknowledged appellant was grabbing her legs to keep her from jumping out of the window, which she repeatedly tried to do as they drove on the freeway; each time, appellant punched her in the ribs or face. In September 2017, while Harrington and appellant were arguing in a park, appellant had his pocketknife out and was "talking about stabbing [her] if [she] didn't talk to him." Also in September 2017, appellant punched Harrington in the face as they were walking in the street, and a bystander called the police. The bystander testified that Harrington fell to the ground when appellant struck her, which Harrington denied.

The incident that resulted in the present case occurred on January 29, 2018. Early that morning, Harrington and appellant were arguing through text messages. Harrington was in her friend Popeye's backyard, in a truck he let her sit in when she needed a place to rest. She knew appellant was supposed to check into a detox program at 9:00 a.m., and was trying to stay away from him until then, thinking she could fall asleep and when she woke up, he would have gone to the program. Appellant came to the side of the truck, Harrington slid from the passenger side to the driver side, and appellant got in. He closed the door, exhaled, looked at Harrington with an expression she knew meant he was upset, and punched her in the nose. He told her not to cry or draw attention to them, and said he would stab her and

2

"would go to jail for killing [her], but not for beating [her] up." She was terrified. When she tried to leave the car, he told her she "wasn't going anywhere." Over the course of almost two hours, he punched her in the nose about every 20 minutes. After what she thought was the fifth punch, she "spit out a blood clot," and wiped the blood coming from her nose on whatever she had in the car, including a sweater and denim shorts. Appellant opened a pocketknife, "held the blade" and "tapped" her on the bridge of her nose with the handle of the knife. Appellant then got out of the car to call his brother and, while on the phone, told Harrington "he had to go before he did kill [her]." Harrington went to the other side of the backyard and acted as though she was using the bathroom while trying to call her "ex," Mark Fosselman, for help. She testified that although they were not in a relationship, Fosselman was always there for her.

When Harrington returned to the truck, appellant was gone. She walked to a friend's house, where she washed her clothes and tried to get the blood off her face. She then met Fosselman, who had called her back as she was walking to the friend's house. When Fosselman saw her injuries and she told him what had happened, he "looked mad, but he was crying." Harrington was with Fosselman the rest of the day. She did not report the incident to the police on January 29 because she did not want appellant to go to jail. She had not reported appellant's prior violence toward her for the same reason, but those incidents had not seemed as bad; this time she thought he was going to kill her, and that was why she "did what [she] did." Harrington acknowledged testifying at the preliminary hearing that she did not want to report this incident because she was "so used to that type of stuff happening, it [didn't] seem like it should matter," and testified that she still felt the same way.

Harrington testified that she "probably" was under the influence of drugs on the morning of January 29, 2018, saying, "I do heroin. I have to do heroin every four to six hours or I get sick." She "probably" was using methamphetamine also. She acknowledged that Fosselman sometimes provided her with heroin.

Before going to the truck that morning, Harrington had cut her wrist, first with her pocketknife and then with a razor blade. She did not remember whether she told appellant she had done this, and denied that he saw her cutting herself in the truck and took the knife away.

The next day, January 30, appellant came by while Harrington was at a mutual friend's house. Harrington felt scared and unsure what was going to happen, and texted Fosselman to come and get her. Fosselman arrived with three friends and Harrington walked toward where he said he had parked, then saw Fosselman chasing appellant. A police officer arrived on the scene, called an ambulance for Harrington, took a statement from her, and took photographs of her. She identified the knife appellant had used from a photograph of three pocketknives the officer showed her.

Brentwood Police Officer Joseph Nunemaker testified that he was dispatched about 12:30 p.m. on January 30, in response to a report of a black male with a bat chasing a Hispanic male, and found a group of people including Harrington and Fosselman. Harrington had two black eyes, her face was bruised and swollen, and there appeared to be blood coming out of her nostril. Nunemaker called an ambulance and took a statement from Harrington. She seemed very scared and nervous, as well as injured; she was having a hard time breathing and talking, her hands and feet were shaking, and she was stammering and looking around. He did not put her through any tests to determine whether she was under the influence of drugs or

4

alcohol, but she did not appear to be. She identified the perpetrator and, after relaying that information to other officers, Nunemaker was advised the suspect had been detained. When Nunemaker told Harrington this, she seemed more comfortable to talk to him. Harrington told Nunemaker details about the assault, including that the driver's side door of the truck did not open, which he concluded was one of multiple reasons she could not leave the truck; Harrington, at trial, denied having said this. Nunemaker also took a statement from Fosselman.

Nunemaker went to the backyard where Harrington told him the assault took place. As soon as he opened the door of the pickup truck cab, he noticed blood on the front seat, a coffee cup with a puddle of blood in it, and blood on the dashboard. There was also what appeared to be coagulated blood and hair on the driver's side floorboard, denim shorts with blood on them, bloody tissues, and a sweatshirt covered in blood. Nunemaker contacted the neighbor, who he knew had a surveillance video camera, but the video showed only the neighbor's own backyard.

Nunemaker contacted appellant at the police station where appellant had been detained. He saw reddening on appellant's knuckles but no bruises, and he did not recall seeing appellant's palms. He was later told that appellant held a pocketknife by the blade and hit Harrington on the nose with the handle. Nunemaker acknowledged having told appellant there was surveillance video when in fact the video did not show the area where the assault took place.

Harrington testified that she and Fosselman had been in a relationship from September 2011, until March 2016, living together in various locations, including with Harrington's mother. Fosselman, who was more than 20 years older than Harrington, had physically attacked her approximately five

5

times prior to January 29, 2018. In April 2016, a little less than a month after Harrington broke up with Fosselman, he saw her in a car with John Hutchinson. When Harrington got out to talk to Fosselman, he grabbed her by her shirt and punched her, then grabbed something like a pitchfork and broke windows on the car. Harrington talked to the police and identified Fosselman as the assailant, and an emergency three-day stay away order was issued. In January 2017, while Harrington was underneath an overpass with her then-boyfriend Albert Stone, Fosselman arrived, looking angry, confronted Harrington, balled up his fist, and swung at Stone. Harrington looked away, then heard Stone running away. She left with Fosselman and "at the top of the street" saw Stone on the ground but did not check on him because Fosselman was "very upset and adamant on us leaving." She testified that she left with Fosselman to diffuse the situation, because she "kn[e]w how he can get" and she was scared for Stone. She insisted she was not scared for herself and had never been scared for her own safety with Fosselman, including when he had harmed her in the past. She told the police what Fosselman had done. Harrington found out later that Fosselman had stabbed Stone.

The jury was read the transcript of testimony given at a 2014 preliminary hearing in a case against appellant involving Deanna Gonzales. Gonzales testified that she had been in a romantic relationship with appellant on and off for seven years, and they had a son together who was four years old at the time of the testimony. She testified that appellant got abusive or aggressive if she did not do what he wanted. They had several physical altercations before she got pregnant with her son. The physical abuse stopped while she was pregnant, but emotional and mental abuse continued, then things got physical again. She had two restraining orders

against appellant, one criminal and one civil, but allowed him to violate them "[b]ecause we have a son together."

Gonzales testified that in August 2014, appellant choked her, leaving a mark on her neck. On September 12, 2014, he threw something through her window, breaking it, and over the next few days sent texts including one saying he should kill her. He had previously threatened to slit her throat, leading her to get the first restraining order. On October 17, appellant became aggressive and refused to leave Gonzales's house. When she turned to grab her purse and leave, appellant held an open pocketknife at her and said if she walked out he would grab her by her hair, pull her back in, and slit her throat. He also said he would kill her and himself. On cross-examination, Gonzales acknowledged that during August and September of 2014, appellant was staying at her house two or three nights a week and they were sexually intimate.

Appellant had two convictions for stalking Gonzales, a misdemeanor conviction in 2014, and a felony conviction in 2015.

**Defense**

Appellant testified that Harrington was a friend with whom he had a sexual relationship "here and there"; they were not in an exclusive relationship and both were "having sex with multiple other people." On January 29, 2018, just before daylight, he "ran into" Harrington in the truck in Popeye's backyard, where he went to wait until it was time to call his brothers for a ride to a 9:00 a.m. appointment at a detox center. She opened the door and slid over for him to get in the truck with her, and they argued, on and off, for about an hour and a half over several things, including "different girls" and appellant going to a drug program. At one point, appellant had been sitting on a log outside the truck and when he came back,

7

Harrington had a knife to her wrist and appellant could see cut marks. He grabbed the knife from her. He did not hit her, prevent her from leaving the truck, or make any threatening statements. There might have been a little blood on Harrington's wrist, but otherwise was no blood in the truck. While they were in the truck, Harrington snorted something he believed was heroin and they smoked "crank" together. Appellant left the truck around 7:30 a.m., then went down the street and called his brother.

Later that night, appellant saw Harrington at a mutual friend's house, where she opened the door and "said something smart" when she realized he was with another woman. Appellant did not see injuries on Harrington's face, but he could not see her face well.

The next day, while standing in a friend's front yard, appellant saw Harrington across the street, walking toward him. He started to walk toward another friend's house and she followed, yelling his name and trying to get him to stop and talk to her. She got to the friend's house a few steps behind him, came in and said something to him, then left; he did not pay attention to what she was saying. Appellant explained he did not want anything to do with Harrington because he was trying to get into a rehabilitation program and she had been trying to talk him out of going, saying she wanted to go to a couples program but not making any effort to get in. He did not notice that Harrington had black eyes.

Asked about Harrington's testimony that he was chased, appellant said he had been walking with a friend when two people approached from the opposite direction, a woman he knew and a man he did not know. The man asked if he was James and, when appellant said yes, grabbed a gun. Appellant pulled out his knife, they started to argue, then the man walked away. A group of people outside a café told appellant they were calling the

police, appellant "took off" and, when he reached the end of the alley, "ran into the same people again along with a few other people," including Harrington and Fosselman, who had a baseball bat. The group was acting aggressively toward appellant. He denied this was because he had broken Harrington's nose the day before and testified that Fosselman was upset that he was sleeping with Harrington. Fosselman had confronted appellant about this a number of times before.

Appellant testified that Officer Nunemaker told him there was surveillance of him from the morning of January 29. He acknowledged that when he spoke with Officer Nunemaker, he initially denied having a sexual relationship with Harrington. He acknowledged having been convicted in 2012 of felony conspiracy to commit a crime.

Appellant's brother testified that he picked appellant up from a gas station in Brentwood around midday on January 29, 2018, to take him to a program in Concord. There was nothing about appellant's appearance that stood out, and no blood on his clothes. It turned out there was no room available at the program, so he dropped appellant back in Brentwood.

Appellant was charged by information filed on March 29, 2018, with one count of injuring a person with a past or present dating relationship (Pen. Code, § 273.5, subd. (a)),[1] one count of battery with serious bodily injury (§ 243, subd. (d)), and one count of false imprisonment by violence (§§ 236/237). Each count alleged that in the commission of the offense, appellant personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (e) [counts 1 and 3], 969f [count 2]) and personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)). Special allegations included that

---

[1] Further statutory references will be to the Penal Code except as otherwise specified.

9

appellant had a prior strike conviction (§§ 667, subds. (d) & (e), 1170.12, subds. (b) & (c)) and prior serious felony conviction (§ 667, subd. (a)(1)), and had served a prior prison term (667.5, subds. (a) & (b)).

A jury found appellant guilty on all charges and found the great bodily injury and deadly weapon allegations true.  Subsequently, the trial court found the prior conviction and prison term allegations true.  Appellant was sentenced on March 15, 2019, to a total of 19 years in prison, consisting of the upper term of four years on count 1, doubled due to the strike conviction, and consecutive terms of five years for inflicting great bodily injury, one year for using a deadly weapon, and five years for the section 667, subdivision (a), prior serious felony conviction.  The court imposed stayed sentences on counts 2 and 3 pursuant to section 654; imposed a three-year term for the section 667.5, subdivision (a), prison prior, stayed for purposes of sentencing only; and struck the section 667.5, subdivision (b), prison prior for purposes of sentencing only.

## DISCUSSION

### I.

Appellant argues the trial court erred in admitting Gonzales's preliminary hearing testimony because the evidence does not demonstrate the prosecutor exercised due diligence in attempting to have her appear at trial.  His argument focuses on the prosecutor's failure to advise the trial court that Gonzales had refused to testify and failed to appear after being subpoenaed for a trial date that was subsequently continued.

A defendant's constitutional right to confront prosecution witnesses is not violated " ' "where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination. . . ." (*Barber v. Page* [(1968) 390 U.S. 719,]

10

722.)' " (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*), quoting *People v. Cromer* (2001) 24 Cal.4th 889, 897 (*Cromer*).) This "traditional exception" to the right of confrontation is codified in Evidence Code section 1291, subdivision (a)(2), which "provides that 'former testimony,' such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if 'the declarant is unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' " (*Herrera,* at p. 621, fn. omitted.)

"A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. [Citation.] . . . ' "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.' (*Ohio v. Roberts* (1980) 448 U.S. 56, 74, disapproved on another point in *Crawford v. Washington* (2004) 541 U.S. 36, 60–68.)" (*Herrera, supra,* 49 Cal.4th at p. 622.)

Similarly, under Evidence Code section 240, subdivision (a)(5), "a witness is unavailable when he or she is '[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process.' (Italics added.) The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.) Considerations relevant to the due diligence inquiry 'include the

11

timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' (*People v. Wilson* (2005) 36 Cal.4th 309, 341 [relying on *Cromer, supra,* 24 Cal.4th at p. 904.) In this regard, 'California law and federal constitutional requirements are the same . . . .' (*People v. Valencia* (2008) 43 Cal.4th 268, 291–292.)" (*Herrera, supra,* 49 Cal.4th at p. 622.)

In reviewing the trial court's determination of unavailability, "[w]e review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard (*Cromer, supra,* 24 Cal.4th at p. 902), and independently review whether the facts demonstrate prosecutorial good faith and due diligence (*id.* at pp. 902–903.)" (*Herrera, supra,* 49 Cal.4th at p. 623.)

After a number of continuances, trial in the present case began on October 19, 2018, and the trial court heard in limine motions on October 22 and 23. One of these was the prosecutor's motion to admit evidence of appellant's prior acts of domestic violence (Evid. Code, § 1109), including incidents involving the mother of appellant's son, Deanna Gonzales. The motion stated that these incidents resulted in appellant pleading to one count of misdemeanor stalking (§ 646.9, subd. (a), and subsequently one count of felony stalking with a prior conviction for stalking (§ 646.9, subd. (c)), and sought to use certified copies of the prior convictions to substitute for witnesses' testimony as proof of appellant's acts. This motion was granted.[2]

---

[2] The motion in limine also addressed prior acts of domestic violence against Harrington, and acts against appellant's former wife. The court denied the motion with respect to the latter incidents, which dated back to 1997 and 1998, and granted it with respect to the incidents involving Harrington.

On October 24, 2018, the court held an Evidence Code section 402 hearing (402 hearing) on the prosecutor's request to introduce Gonzales's testimony at the 2014 preliminary hearing in the case that resulted in appellant's felony stalking conviction. Jim Posada, an investigator for the Contra Costa County District Attorney's Office, testified that he was asked to subpoena Gonzales and, on August 3, determined that the last known address he had been provided was an abandoned address. He searched addresses previously associated with Gonzales, left a copy of the subpoena at one of them, and received a call from the resident saying she had not seen Gonzales in about eight months, but would try to get the subpoena to her through a mutual friend. Posada searched other addresses for Gonzales, contacted people on the street who might know her, and spoke with a man who said he would try to get her a message, but this did not turn out to be fruitful. Posada eventually found an address for Gonzales in Pittsburg and on August 30, left a copy of the subpoena at the door, then canvassed some neighbors who identified her as living at the address. The next day, he received a call from Gonzales, who verified her identity by providing her birth date and driver's license number and confirmed receipt of the subpoena. She was very angry and said she would have "absolutely nothing to do with the court proceedings," would not come to court, would not testify against the father of her son, and would "go to jail before coming to court." When the trial was continued to October 2, Posada personally served a subpoena for the new trial date. Gonzales "pretty much restated" what she had said on the phone on August 31, saying she would rather be arrested than testify. On October 23, the day before the 402 hearing, Posada went to Gonzales's address, knocked on the door and heard sounds inside, but no one opened the door.

The prosecutor represented that Gonzales did not appear for court on October 2.

The trial court found due diligence had been shown in that Posada investigated addresses he found for Gonzales and looked for further leads "out on the street," found Gonzales once by telephone and once in person, and Gonzales "was pretty clear that she wasn't showing up and didn't show up."[3]

Many of the cases appellant relies upon state general principles of little direct relevance to the specific issue before us. This is not a case in which the prosecutor made no effort to secure a vital witness's presence in court. (*Barber v. Page, supra,* 390 U.S. at p. 720 [prosecution made no effort to secure presence of witness upon learning he was in federal custody in another state].)[4] Nor is it a case in which the prosecution contributed to a critical witness's absence. (*People v. Louis* (1986) 42 Cal.3d 969 (*Louis*) [witness testified at codefendants' trial pursuant to deal with prosecutor allowing release on own recognizance after testimony, then, once released,

---

[3] Acknowledging defense counsel's concern that there might be material in the preliminary hearing transcript that would be irrelevant or prejudicial in the present case, the court said it would be appropriate to redact portions as irrelevant or under Evidence Code section 352 and asked the parties to go through the transcript and bring to the court any areas of dispute.

[4] In *Barber v. Page, supra,* 390 U.S. 710, the absent witness's preliminary hearing testimony was the principal evidence against the defendant at trial. In holding the witness was not unavailable for confrontation clause purposes, the court discussed available options the prosecution could have exercised to bring the witness to the trial, such as appealing to federal courts' power to issue writs of habeas corpus to secure a witness's testimony at the request of state prosecutorial authorities or to the federal Bureau of Prisons' policy of permitting inmates to testify pursuant to a state court's writ of habeas corpus. (*Id.* at pp. 724–725.)

14

disappeared before defendant's trial].)[5]  Appellant relies upon *Louis* for its statement that the prosecutor has a duty to " 'use reasonable means to prevent a present witness from becoming absent,' " as well as to exercise due diligence in attempting make an absent witness present (*id.* at p. 991), but it is not apparent what relevance that rule has to the facts in the present case.

Presumably due to the prosecutor's investigator's unsuccessful attempt to contact Gonzales after the present trial had begun, appellant points to *People v. Avila* (2005) 131 Cal.App.4th 163 (*Avila*), in which the prosecution waited until the first day of the defendant's retrial, three months after a mistrial, to attempt to serve a subpoena on an important witness, discovered she had moved and was unable to find her over the next two days.  (*Id.* at p. 167.)  The *Avila* court reversed the trial court's finding of diligence, explaining that "[w]aiting until the morning a trial begins to try to locate a witness after being out of touch for several months is generally not prudent or reasonable, and certainly is not an untiring effort to secure a witness's presence at trial.  [Citation.]  Witnesses have jobs, they plan vacations

---

[5] In *Louis,* the most critical prosecution witness testified at the defendant's preliminary hearing and at a trial of several codefendants that ended in a mistrial.  (*Louis, supra,* 42 Cal.3d at pp. 976, 978, 989.)  The witness, who was in custody awaiting charges in one case and sentencing in another, had refused to testify at the codefendants' trial until the prosecutor agreed to a deal in which he would be released on his own recognizance for the weekend between his testimony and his sentencing hearing; upon release pursuant to the deal, he disappeared and could not be located to testify at the defendant's trial and retrial of the codefendants.  (*Id.* at pp. 978, 990.)  Reversing the trial court's decision allowing the prosecution to introduce the witness's prior testimony, *Louis* noted that the prosecutor was aware of the likelihood the witness would abscond, as the witness was known to be "unreliable and of suspect credibility," and made no effort to keep track of where the witness would be during the weekend release or otherwise prevent his disappearance.  (*Id.* at pp. 991–993.)

[citation], they have child-care responsibilities, they leave town for a few days. A party who wanted to ensure a witness was available to testify would usually plan ahead, and not wait a day or two before the testimony was needed." (*Id.* at p. 169.) While a decision to wait until the last minute might be reasonable in the case of a witness known to be uncooperative and afraid of testifying, who might be expected to leave a known location if given advance notice (*People v. Diaz* (2002) 95 Cal.App.4th 695, 707), the witness in *Avila* appeared to be cooperative and without fear. (*Avila,* at p. 169.)

There is no evidence in the present case why, after the trial date in early October was continued to later in the month, the prosecutor's investigator did not attempt to contact Gonzales until after the trial had begun. Unlike the situation in *Avila,* however, the lapse in time was only a few weeks, rather than a few months, and the witness remained at the same address; the problem was not being unable to locate Gonzales but that no one responded to the investigator's knock despite sounds from inside indicating someone was there. Since Gonzales had twice been subpoenaed to testify and stated her refusal to do so, then failed to appear on October 2, the decision to contact her immediately before her testimony was needed may be more justifiable than the decision in *Avila,* where the witness had appeared to be cooperative. *People v. Diaz, supra,* 95 Cal.App.4th 695, found reasonable diligence despite the prosecution not attempting to subpoena the witness until the beginning of trial because the witness was afraid to testify and purposefully attempting to avoid service, and a detective familiar with the case and witness believed serving her in advance of trial would have ensured her unavailability. (*Id.* at pp. 706–707.) While the factual record in *Diaz* was more extensive than in the present case, the relatively short passage of time

16

and Gonzales's demonstrated intention to refuse to testify distinguish it from *Avila.*

Appellant's real challenge is to the prosecution's conduct—or lack thereof—after learning Gonzales did not intend to testify. Appellant argues the prosecutor failed to exercise due diligence because she did not request issuance of a bench warrant to secure Gonzales's presence in court and, prior to the 402 hearing, did not inform the court of Gonzales's refusal to testify and failure to appear on October 2. In appellant's view, Gonzales's statement of her intent to disobey the subpoena "triggered a duty to bring the matter to the court's attention and thereby allow the court to convince or compel Gonzales to testify."[6]

In *People v. Sul* (1981) 122 Cal.App.3d 355 (*Sul*), the case appellant offers to support this argument, a critical witness testified at the defendant's preliminary hearing, but refused to testify at trial and was sentenced to five days in jail. After that trial ended in a mistrial, at a second trial, the witness requested that his attorney be present during questioning. He was allowed to consult with his attorney by phone during a recess, then when questioning resumed he refused to testify without his attorney's presence, despite the

_____

[6] Although defense counsel argued against admission of the preliminary hearing transcript, he did not object on the basis of the prosecutor's failure to inform the court of Gonzales's failure to appear in court on October 1, and prior expressions of unwillingness to testify. Anticipating respondent's assertion of the forfeiture doctrine, appellant filed a supplemental letter brief raising this as one of several claims of ineffective assistance of counsel. Respondent, however, does not argue forfeiture, explaining that "appellant's argument is that the *prosecution* had a duty to report Gonzales's reluctance to the trial court." Although it is not clear to us how this explanation excuses defense counsel's failure to raise the prosecutor's failure to satisfy her alleged duty in challenging the prosecution's showing of diligence, we will address the merits of appellant's argument.

court's reminder that it could impose sanctions and send him to jail. The court ordered him committed to jail until he was willing to testify and allowed his preliminary hearing testimony to be read to the jury. (*Id.* at pp. 358–359.)

The *Sul* court held that the former testimony of a witness who is physically available but refuses to testify is permissible only if the trial court makes a finding of unavailability "after taking reasonable steps to induce the witness to testify unless it is obvious that such steps would be unavailing." (*Sul, supra,* 122 Cal.App.3d at pp. 364–365.) Noting that the trial court acted inconsistently in ordering the witness jailed until he was willing to testify, then immediately admitting his preliminary hearing testimony, *Sul* discussed several alternative measures the trial court could have taken, including waiting the hour and a half until the witness's attorney had said he might be available, committing the witness to jail for the weekend, then determining whether he was willing to testify, and explaining to the witness that he could be prosecuted for criminal contempt of court. (*Id.* at pp. 365–366.) The *Sul* court also pointed out that the prosecutor should have informed the trial court before trial of the difficulty with the witness at the first trial, so the court could have determined whether the witness would testify and, if he indicated he would not, warned prospective jurors that a recess during trial might be necessary. (*Id.* at p. 366.)

*Sul* dealt with a different situation than the present case: The witness was physically present in court and the issue was the reasonableness of the *trial court's* efforts to induce the witness to testify, not the prosecutor's diligence in attempting to secure the witness's presence in court. Additionally, the witness in *Sul* was critical to the prosecution's case. (*Sul, supra,* 122 Cal.App.3d at p 359.) Gonzales's testimony did not directly

18

address appellant's conduct toward Harrington in the charged offenses; it was relevant only as evidence of past conduct that might tend to prove he was disposed to commit such offenses. (Evid. Code, § 1109, CALCRIM No. 852A.) Contrary to appellant's suggestion, *Sul* does not necessarily establish a "duty" for the prosecutor to inform the court of a witness's refusal to comply with a subpoena to testify. The *Sul* court simply held that in the circumstances of that case—a critical witness who was present in court and refused to testify, and had previously served a jail sentence for refusing to testify in the defendant's prior trial—the prosecutor "should" have informed the court before trial of the previous problem with the witness. (*Sul,* at p. 366.)

As appellant points out, the prosecution's motion to admit evidence of appellant's offenses against Gonzales, filed just before the trial began on October 19, did not mention her failure to comply with the subpoena to appear on the previous trial date of October 2. Appellant views the prosecution's failure to bring the issue to the court's attention as an example of it "hinder[ing], rather than assist[ing], the court in ensuring that all available options were used to convince Gonzales to testify in person." The in limine motion, however, sought to use certified copies of appellant's stalking convictions (Evid. Code, § 452.5) "to substitute for the testimony of witnesses to prove" his prior domestic violence, and the court granted the motion. Had the prosecutor followed this course, Gonzales's testimony would not have been necessary. The record does not clarify when or why the prosecution changed course, and we decline to assume it was acting in bad faith.[7]

_____

[7] Appellant suggests it may have been to the prosecution's advantage to use Gonzales's prior testimony rather than having her testify at trial, as Gonzales's "apparent sympathy for appellant and her refusal to cooperate

19

It is also unclear there is much the trial court could or would have done if the prosecutor had alerted it sooner to Gonzales's stated intention not to testify. Appellant urges the court could have appointed a domestic violence counselor to confer with Gonzales (Code Civ. Proc., § 1219, subd. (b).), or issued a bench warrant to compel her presence at a pretrial hearing where the court could have tried to convince her to testify, including by informing her that refusal would result in her preliminary hearing testimony being admitted. It is, of course, speculative whether such actions would have weakened Gonzales's demonstrated resolve not to testify. As for more coercive measures, appellant acknowledges that, as a victim of domestic violence, Gonzales could not be incarcerated for refusing to testify concerning

with the prosecution made her testimony unpredictable and fraught with possible bad outcomes for the prosecution" while her preliminary hearing testimony "did not suffer from this down side." *Louis, supra,* 42 Cal.3d 993, made this point, suggesting the prosecution's failure to take any steps to address the entirely foreseeable (and foreseen) prospect of the witness absconding once released from custody pursuant to the deal with the prosecutor (see fn. 4, *ante*) "may suggest something other than mere indifference. . . . He may have taken no steps to prevent Tolbert's disappearance after the first trial because he had the testimony from defendant's preliminary hearing which could be used if Tolbert became unavailable. Indeed, the prosecutor may have taken no steps because he hoped that Tolbert would disappear, since as the court recognized '[Tolbert] would not look as good in person as he does in reading out of the transcript . . . .' " (*Id.* at p. 993, fn. 7.)

In *Louis,* however, the jury's ability to assess the witness's credibility was particularly important because "[t]here was no witness whose testimony was more critical to the prosecution's case . . . ." (*Louis, supra,* 42 Cal.3d at p. 989.) Here, the prosecution wanted Gonzales's testimony only to demonstrate that appellant had engaged in past conduct supporting an inference that he was predisposed to commit domestic violence. Had Gonzales appeared at trial and testified to anything inconsistent with her preliminary hearing testimony, she could have been impeached with that prior inconsistent testimony.

that violence.  (Code Civ. Proc., § 1219, subd. (b).)  And " '[t]rial courts "do not have to take extreme actions before making a finding of unavailability." ' " (*People v. Cogswell, supra,* 48 Cal.4th at p. 479 (*Cogswell*), quoting *People v. Smith* (2003) 30 Cal.4th 581, 624 (*Smith*).)

Appellant's attempts to distinguish *Cogswell* and *Smith* are not persuasive.  In *Cogswell,* the victim of a rape, who lived in Colorado, failed to appear after being subpoenaed pursuant to a statute enabling a California court in a criminal case to request issuance of a subpoena from a court in the state where a material witness is located.  *Cogswell* upheld the trial court's finding of unavailability over the defendant's argument that the prosecution had not shown reasonable diligence because it did not invoke a statutory provision for having the out-of-state witness taken into custody and delivered to California to testify.  (*Cogswell, supra,* 48 Cal. 4th at pp. 477–479.) Referring to the *Cogswell* court's comment that, "[h]aving spoken directly to [the witness], the prosecutor was in the best position to assess the strength of her determination not to testify at defendant's trial" (*id.* at pp. 479–480), appellant argues the prosecutor here did not speak directly to Gonzales and therefore was not more likely than the court to be able to assess the likelihood she could be convinced to testify.  We do not read *Cogswell* as suggesting the prosecutor's ability to assess the witness's determination not to testify must always be weighed against the court's potential ability to do so.  Rather, in explaining why it was reasonable for the prosecutor to choose not to request that the witness be taken into custody and transported from Colorado, *Cogswell* noted that the prosecutor's communication with the witness enabled the prosecutor to assess whether further measures to secure her testimony should be undertaken.  Here, the prosecutor's investigator had

the direct communications that demonstrated the witness's unwillingness to testify.

Appellant also points out that Gonzales would not need to be forcibly transported from another state and incarcerated pending trial and argues that Gonzales was not likely to have been as traumatized by testifying as the witness in *Cogswell.* Even if we assume the latter point to be true, that more extreme measures or motivations were at issue in *Cogswell* does do not necessarily mean the efforts in this case were insufficient. Appellant emphasizes the statement in *Ohio v. Roberts, supra,* 448 U.S. at page 74, that "if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." But the court went on to say, " 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citations.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." (*Ibid.*) If the prosecution " 'used reasonable efforts,' " the conclusion that it exercised reasonable diligence is not affected by the fact " ' "[t]hat additional efforts might have been made or other lines of inquiry pursued . . . ." ' " (*People v. Valencia, supra,* 43 Cal.4th at p. 293, quoting *People v. Wilson* (2005) 36 Cal.4th 309, 342.)

*Smith, supra,* 30 Cal.4th 581, was not about the prosecutor's diligence in attempting to secure a witness's testimony; as in *Sul,* the issue was the reasonableness of the *court's* effort to induce a present witness to testify. *Smith* upheld the trial court's finding of unavailability and admission of the preliminary hearing testimony of a witness whose rape was one of many offenses the prosecution presented during the penalty phase of the defendant's capital trial. (*Smith,* at p. 624.) The court had ruled the witness

22

could be asked about the impact of the offense on her but not about her opinion on penalty. (*Id.* at p. 621.) The witness refused to testify unless she could express her views on punishment and, upon questioning by the court under oath, said nothing, including prosecution for criminal contempt, would change her mind. (*Ibid.*) *Smith* held the trial was not required to do more, rejecting the defendant's argument that the trial court should at least have fined the witness for contempt of court. (*Id.* at p. 624.) Respondent cites *Smith* for its comment, after observing that the defendant had not asked the court to take stronger action, "Because [the witness] was clearly trying to help defendant in refusing to testify against him, he could reasonably not have actually wanted to force her to testify by threat of contempt charges." (*Id.* at p. 624.) The same is true here.

In any event, unlike the situations in the cases appellant relies upon, Gonzales was not a critically important witness for the prosecution, a factor bearing both on assessment of the prosecution's diligence (*Herrera, supra,* 49 Cal.4th at p. 622) and on whether any error in admitting the prior testimony was prejudicial. Gonzales's testimony, as we have said, was relevant to appellant's propensity to commit domestic violence. To be sure, the evidence was significant: It described at some length, several incidents in which appellant physically abused Gonzales and/or threatened and caused her to fear for her safety. But even without Gonzales's testimony, the jurors would have had the evidence of appellant's two convictions for stalking Gonzales, offenses they were informed consisted of "willfully, maliciously, repeatedly, and unlawfully harassing Deanna Gonzales, and unlawfully making a credible threat against Deanna Gonzales, with the intent that Deanna Gonzales be placed in reasonable fear for her safety and the safety of her immediate family." And there was evidence of appellant's prior acts of

23

domestic violence against Harrington, including a bystander's testimony concerning one of the incidents, as well as Harrington's testimony. The potential prejudice from Gonzales's preliminary hearing testimony, then, is that it provided details about appellant's conduct toward Gonzales, including threats to kill her and actual violence (choking), as well as threats.

Ultimately, the question at trial was whether the jury was convinced beyond a reasonable doubt that the injuries Harrington sustained on January 29, 2018, were inflicted by appellant and not, as appellant maintained, by Fosselman. The case turned on the jury's assessment of Harrington's, and appellant's, credibility. Harrington freely acknowledged that Fosselman had been violent toward her, and toward men he believed her to be involved with, and defense counsel identified potential inconsistencies and gaps in the prosecution's evidence that supported the possibility Fosselman could have inflicted Harrington's injuries at some point after appellant left the truck. Defense counsel also emphasized motivations Harrington could have had for identifying appellant as the perpetrator even if it was in fact Fosselman, and reasons to question her credibility in general. The prosecutor, in turn, pointed to inconsistencies in appellant's defense and evidence that Harrington had not hesitated to talk to the police on occasions when Fosselman had been violent in the past. Given the other evidence of appellant's propensity to commit domestic violence, which included a bystander's testimony regarding one of the incidents Harrington described, we perceive virtually no possibility the jury would have reached a different conclusion if it had not heard Gonzales's preliminary hearing testimony. Any error in admitting the evidence was harmless beyond a reasonable doubt.

24

At trial, the defense theory was that Fosselman, not appellant, was responsible for Harrington's injuries. The trial court permitted the defense to introduce evidence of Fosselman's prior acts of violence toward Harrington and men she was with for the purpose of showing any effect it had on Harrington, such as motivating her to blame appellant for violence that Fosselman inflicted, but not for the purpose of showing Fosselman had a predisposition to commit domestic violence. Appellant contends the jury instructions effectuating this ruling unconstitutionally prohibited the jurors from relying upon Fosselman's prior domestic violence to infer he was Harrington's assailant while allowing them to infer appellant's guilt from his prior domestic violence. Appellant acknowledges that permitting the jury to view his prior domestic violence as showing propensity to commit the charged offense, while prohibiting the jury from drawing the same inference against Fosselman, is consistent with the relevant statutes, but argues the instructions violate constitutionally guaranteed fundamental fairness.

Evidence Code section 1101 prohibits evidence of a person's character "to prove his or her conduct on a specified occasion" except in specified instances. One of the exceptions is stated in Evidence Code section 1109: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).)

Like Evidence Code section 1108, which permits evidence of a defendant's prior commission of sex offenses to show propensity to commit offenses of the same type, Evidence Code section 1109 reflects the Legislature's determination that in the context of domestic violence, prior

25

offenses of the same type are "uniquely probative." (*People v. Britt* (2002) 104 Cal.App.4th 500, 506 [sex offenses].) As explained in a bill analysis prepared for the measure by which Evidence Code section enacted, " '[p]roponents argue that in domestic violence cases, as in sexual offense cases, special evidentiary rules are justified because of the distinctive issues and difficulties of proof in this area. Specifically, evidence of other acts is important in domestic violence cases because of the typically repetitive nature of domestic violence crimes, and because of the acute difficulties of proof associated with frequently uncooperative victims and third-party witnesses who are often children or neighbors who may fear retaliation from the abuser and do not wish to become involved.' [¶] . . . . [B]y enacting [Evidence Code] sections 1108 and 1109, the obvious intention of the Legislature was to provide a mechanism for allowing evidence of past sexual offenses or acts of domestic violence to be used by a jury to prove that the defendant committed the charged offense of the same type; recidivist conduct the Legislature has determined is probative because of its repetitive nature. Furthermore, it is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited." (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1333, quoting Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, p. 4.)

In their in limine motions, the parties argued the admissibility of third party culpability evidence, the prosecutor maintaining there was no evidence linking Fosselman to the assault, and motive and opportunity were insufficient bases for admission. The trial court ruled (as clarified in additional discussion during the trial) that it would allow competent evidence

26

of violence between Fosselman and Harrington for its bearing on Harrington's credibility, to show the effect of such violence on Harrington and "whether it motivated her to finger someone else for this incident." The court made clear that the such evidence could not be used to argue Fosselman had a propensity for violence, although the defense was free to argue that Fosselman was responsible for Harrington's injuries.

Accordingly, the jury was instructed: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. [¶] You heard evidence about Mark Fosselman's prior conduct. Do not consider this evidence for any other purpose except for the limited purpose of its affect, if any, on Ms. Meghann Harrington."

In accordance with Evidence Code section 1109, the jury was instructed: "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically, past violence and threats against Deanna Gonzales, stalking Deanna Gonzales in 2013 and 2014, past violence and threats against Meghann Harrington. [¶] . . . [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision also conclude that the defendant was likely to commit, and did commit, injuring a person with a past or present dating relationship, count one, battery with serious bodily injury count two, as charged here. [¶] If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all of the other evidence. [¶] It is not sufficient by itself to prove that the defendant is guilty of injuring a person with a past or present dating relationship, count one, or battery

27

with serious bodily injury, count two. The People must still prove each charged allegation beyond a reasonable doubt. . . ." (CALCRIM No. 852A.)

Acknowledging that he did not object to the instruction in the trial court, appellant argues his claim is not forfeited because section 1259 allows this court to "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Respondent argues, however, that despite framing it as a claim of instructional error, appellant is really challenging the trial court's evidentiary ruling excluding third party propensity evidence and, if appellant's substantial rights were affected, it was by the ruling and not the instructions consistent with that ruling. As appellant did not object to the ruling that evidence of Fosselman's violence could not be used to show propensity, appellant forfeited any direct challenge to that evidentiary ruling. (§ 1259.)

Appellant points to cases in which the California Supreme Court has permitted challenges to jury instructions under section 1259 in the absence of an accompanying challenge to the underlying ruling. For example, in *People v. Hannon* (1977) 19 Cal.3d 588, the defendants challenged an instruction permitting jurors to infer consciousness of guilt from evidence of suppression of evidence. The court specifically stated that although the defendants' failure to object to the trial court's admission of the evidence relied upon to show suppression forfeited any error in admitting that evidence, under section 1259 an objection was not required to preserve a challenge to jury instructions if the defendants' substantial rights were affected. (*Hannon*, at p. 600.)

We need not resolve whether section 1259 preserves appellant's claim. Appellant also argues that if we find the claim forfeited, his attorney's failure

28

to object below constituted ineffective assistance of counsel. Accordingly, we would have to consider the merits in one context or the other. Context would matter if the ultimate resolution of this case turns on an analysis of prejudice: In directly reviewing the claim that appellant's constitutional rights were violated by the alleged instructional error, we would have to determine whether any error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18), while a conclusion that counsel rendered ineffective assistance of counsel would require us to determine only whether there is a reasonable probability the result would have been more favorable if counsel had objected (*People v. Watson* (1956) 46 Cal.2d 818, 836). As we will explain, however, in the circumstances of this case any error would be harmless under either standard.

Appellant argues that preventing him from using propensity evidence as part of his third party culpability defense violated his constitutional right to " 'a meaningful opportunity to present a complete defense' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690, quoting *California v. Trombetta* (1984) 467 U.S. 479), which "is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are ' "arbitrary" or "disproportionate to the purposes they are designed to serve." ' [Citation.]" (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324–325.) " '[A]rbitrary' rules" exclude "important defense evidence" without serving "any legitimate interests." (*Id.* at p. 325.) In appellant's view, there is no justification for failing to apply to Fosselman the same reasoning that justifies viewing appellant's prior domestic violence as tending to show his responsibility for the charged domestic violence—that is, for prohibiting the jury from drawing an inference against Fosselman that it is allowed to draw against appellant.

Appellant argues the jury instructions created an unconstitutional asymmetry between the prosecution and the defense.  He quotes at length from *Harris v. Thompson* (7th Cir. 2012) 698 F.3d 609, 632 (*Harris*), which noted that "a state rule that restricts the presentation of testimony for the defense but not the prosecution will generally be deemed arbitrary."  *Harris* listed a number of cases in which the United States Supreme Court has " 'struck down asymmetric witness rules, and noted the asymmetry.' " (*Id.* at pp. 632–633, quoting Akhil Reed Amar, *Sixth Amendment First Principles* (1996) 84 Geo. L.J. 641, 700; *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57 & fn. 14 [confidentiality of state protective service agency records enforced against defendant subpoena; court declines to express opinion whether result "would have been different if the statute had protected the CYS files from disclosure to *anyone,* including law-enforcement and judicial personnel"]; *Green v. Georgia* (1979) 442 U.S. 95, 97 [exclusion of hearsay statement defendant sought to introduce where prosecution introduced same statement in another criminal proceeding]; *Cool v. United States* (1972) 409 U.S. 100, 103 fn. 4 [instruction told jury it could convict solely on basis of accomplice testimony but did not say jury could acquit solely on this basis, where defendant put accomplice on the stand]; *Chambers v. Mississippi* (1973) 410 U.S. 284, 295–298 [defendant barred from impeaching own witness, whom prosecution was free to impeach]; *Webb v. Texas* (1972) 409 U.S. 95, 96, 98 (per curiam) [trial judge intimidated sole witness for defense, not prosecution witnesses]; *Washington v. Texas* (1967) 388 U.S. 14, 22 [accomplices allowed to testify for government, not for defendants].)

The premise of appellant's argument is somewhat weakened by the fact that the evidence of Fosselman's prior acts of violence included not only violence directed toward Harrington but also violence directed toward men

she was involved with. The latter, of course, is not domestic violence and therefore could not be the basis for the inference permitted by Evidence Code section 1109. As explained in *People v. Shorts* (2017) 9 Cal.App.5th 350, 361 (*Shorts*), "[t]here is no fundamental unfairness in allowing the prosecution to introduce propensity evidence that fits under a limited statutory exception while prohibiting the defense from introducing propensity evidence that fits under no statutory exception."[8] Harrington described one incident in which Fosselman assaulted her and testified that he had physically attacked her approximately five times. But the incident emphasized by the defense at trial was the one in which Fosselman stabbed Harrington's then-boyfriend: It was this incident defense counsel highlighted in closing argument as demonstrating Harrington's fear of Fosselman.

---

[8] In *Shorts, supra,* 9 Cal.App.5th at page 358, as here, the defendant relied upon a third party culpability defense and argued exclusion of propensity evidence concerning the third party resulted in a constitutionally impermissible asymmetry because the prosecution was permitted to present propensity evidence against the defendant. The defendant was convicted of sex offenses and murder, and, pursuant to Evidence Code section 1108, the prosecution presented evidence he had sexually assaulted his former girlfriend three years before the charged offenses. The defense sought to present evidence that the third party it was attempting to incriminate had a propensity for violence evidenced by his having shot at his ex-girlfriend. The *Shorts* court observed that even if a defendant could use propensity evidence under Evidence Code sections 1108 or 1109 in attempting to show third party culpability, the evidence of propensity for violence in that case would not have been admissible under the former, as it did not involve a sex offense, or the latter, as the charged offense did not involve domestic violence. (*Shorts,* at pp. 360–361.) Accordingly, *Shorts* found it unnecessary to decide whether a defendant must be permitted to introduce propensity evidence under Evidence Code sections 1108 or 1109 when the prosecution has been able to do so. (*Id.* at p. 358.)

31

Even focusing on the evidence of prior domestic violence, however, the asymmetry appellant perceives is not so clear.[9] The present case does not involve a rule preventing the defense from utilizing the same evidence the prosecution would be able to use, as when a rule permits an accomplice to testify for the prosecution but not the defense (*Washington v. Texas, supra,* 388 U.S. 14), or prohibits a defendant from impeaching his own witness while allowing the prosecutor to impeach that witness (*Chambers v. Mississippi, supra,* 410 U.S. 284). Instead, appellant is comparing the treatment of propensity evidence relating to the defendant with propensity evidence relating to a third party. "Third party culpability evidence is admissible if it is 'capable of raising a reasonable doubt of defendant's guilt.'" (*People v. Page* (2008) 44 Cal.4th 1, 38, quoting *People v. Hall* (1986) 41 Cal.3d 826, 833.) But "'[e]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.'" (*Ibid.*) Evidence that only shows "'the third party was the more likely perpetrator because he had a history of violence. [Citation.] Such evidence does not amount to direct or circumstantial evidence linking the third person to the actual perpetration of the crime.'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 373, quoting *People v. Davis* (1995) 10 Cal.4th 463, 501.)

Here there was no evidence linking Fosselman to the assault on the morning of January 29 or location where it occurred, only the suggestion he *could have* assaulted Harrington sometime after she and appellant parted

---

[9] Respondent's brief fails to address the substance of appellant's claim, arguing little more than that the trial court's rulings and instructions were consistent with Evidence Code sections 1101 and 1109. Appellant's argument is that what the statutes allow is unconstitutional.

ways that morning and before Harrington's injuries were observed by Officer Nunemaker the following day. The instructions permitting the jury to infer appellant committed the charged acts of domestic violence because his past acts of domestic violence showed he was inclined to commit such acts also directed that this inference was "only one factor to consider along with all the other evidence" and "not sufficient by itself to prove that [appellant] is guilty" of the present charges. (CALCRIM No. 852A.) As applied to appellant, propensity to commit domestic violence was an additional factor strengthening a case built on other evidence that he committed the charged offenses. By contrast, instructing the jury that it could conclude Fosselman "was disposed or included to commit domestic violence" and, based on that conclusion, "likely" to commit the assault on Harrington (CALCRIM No. 852A), in the absence of any evidence actually connecting Fosselman to Harrington's injuries, would in effect have encouraged the jury to use predisposition evidence to establish the missing connection—contrary to the rules governing third party culpability evidence.[10]

---

[10] Appellant also relies upon two cases involving asymmetry in the context of discovery. *Wardius v. Oregon* (1973) 412 U.S. 470, 472, 475 (*Wardius*), reversed the conviction of a defendant who was prevented from presenting an alibi defense for failure to comply with a state statute that required defendants to provide notice of an alibi defense but afforded defendants no discovery rights, including no right to notice of witnesses the prosecution plans to use to refute the alibi defense. The court emphasized the unfairness of this asymmetry: "The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." (*Id.* at pp. 475–476, fn. omitted.)

33

In any event, we can discern no prejudice to appellant from the instructions. Appellant was permitted to argue that Fosselman was the actual perpetrator, and did so forcefully. Appellant argued Harrington was not credible, noting the absence of evidence that anyone saw her with injuries between the morning of January 29 and the following day, despite her testimony that she visited friends during this time, suggesting holes in the prosecution's case such as the absence of evidence that appellant's hand was cut despite Harrington's testimony that he held his pocketknife by the open blade when he hit her with it, and questioning why, if appellant caused Harrington's injuries, Fosselman would not have taken her to the hospital or would have waited until the following day to confront appellant. The defense argued Harrington was afraid of Fosselman due to his violence toward her and men she was involved with, highlighting her leaving her then-boyfriend on the ground after Fosselman stabbed him because Fosselman wanted her to go with him, and argued that Fosselman was the one who assaulted Harrington but she accused appellant because of her fear of Fosselman.

---

In *Evans v. Superior Court* (1974) 11 Cal.3d 617, 623, a defendant who claimed the witnesses' on-scene identification was faulty moved for a pretrial lineup, which the trial court agreed would be fair but did not believe it had the discretion to order. Holding due process required the motion be granted, *Evans* applied *Wardius,* explaining, "[b]ecause the People are in a position to compel a lineup and utilize what favorable evidence is derived therefrom, fairness requires that the accused be given a reciprocal right to discover and utilize contrary evidence." (*Ibid.*)

The underlying principles of fairness and symmetry addressed in these cases are the same as in the cases discussed above. *Wardius* and *Evans* do not provide appellant further direct support, as the present case involves evidentiary and instructional issues, not pretrial discovery. (*Shorts, supra,* 9 Cal.App.5th at p. 360 [distinguishing *Wardius*].)

In short, the defense made a clear argument that, based on the evidence of Fosselman's past acts of violence toward Harrington and men she was involved with, the jury should consider the likelihood that it was Fosselman who assaulted Harrington on January 29. Although expressly framed as an explanation for why Harrington would have blamed appellant for an assault Fosselman in fact committed—Harrington was afraid to name Fosselman as her assailant because of his past acts of violence—the obvious ultimate point was that the jury should use the evidence of past acts to conclude Fosselman was responsible for the present acts as well. It is difficult to imagine how a juror who did not have a reasonable doubt as to appellant's guilt based on the evidence of Fosselman's past violence and the defense argument would have come to a different conclusion if explicitly told it was permitted to infer Fosselman was predisposed to commit the type of violence he was shown to have committed on prior occasions.

### III.

Appellant challenges the sentence enhancements imposed under section 667.5, subdivisions (a) and (b). Respondent concedes both issues.

First, appellant contends the one-year enhancement under section 667.5, subdivision (b), which the trial court ordered stricken for purposes of punishment, must be dismissed due to statutory changes that became effective after his sentencing.

Prior to 2020, section 667.5, subdivision (b), provided for a consecutive one-year term for each "prior separate prison term . . . for any felony." Effective January 1, 2020, section 667.5, subdivision (b), was amended to make this enhancement for prison terms applicable only to prison terms for "a sexually violent offense." (Stats. 2019, ch. 590, § 1.) Respondent agrees that this amendment, which reduces the punishment of an offense, applies

retroactively to cases not yet final before its effective date. (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681–682; *In re Estrada* (1965) 63 Cal.2d 740.) The section 667.5 priors alleged in the information and found true by the trial court were for convictions of inflicting corporal injury with use of a firearm and for stalking. As these were not sexually violent offenses, respondent agrees the section 667.5, subdivision (b), must be dismissed.

Additionally, trial court imposed a five-year term under section 667, subdivision (a), and imposed, but stayed, a three-year term under section 667.5, subdivision (a), for the prior prison term resulting from appellant's 1998 conviction of infliction of corporal injury on a spouse or cohabitant with use of a firearm. Enhancements under section 667, subdivision (a), and section 667.5, subdivision (a), cannot be imposed on the basis of a single prior offense and prison term; only the greater enhancement may be imposed. (*People v. Jones* (1993) 5 Cal.4th 1142, 1150.) Respondent agrees that the three-year term imposed pursuant to section 667.5, subdivision (a), must be stricken. (*Jones,* at p. 1153.)

## DISPOSITION

The judgment is modified to strike the three-year term imposed pursuant to section 667.5, subdivision (a), and the one-year term imposed under section 667.5, subdivision (b). The trial court is directed to send to the Department of Corrections and Rehabilitation a corrected abstract of judgment with these enhancements stricken. As so modified, the judgment is affirmed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


*People v. Taylor* (A156864)